**MILES PRODUCTION COMPANY and Ellison Miles, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 30254.

United States Court of Appeals, Fifth Circuit.

April 3, 1972.

Wright Matthews, Robert K. Sands, O. Jan Tyler, Dallas, Tex., Robert L. Trimble, Dallas, Tex., for petitioners-appellants.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, William A. Friedlander, John A. Townsend, Attys., Tax Div., Dept. of Justice, Washington, D. C., K. Martin Worthy, Ch. Cnsl., Daniel J. Boyer, Issie L. Jenkins, Attys., IRS, Washington, D. C., Johnnie M. Walters, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before JONES, BELL and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The taxpayers appeal from a decision of the United States Tax Court holding that certain losses were suffered in 1961 on nonbusiness debts, as defined by Title 26 U.S.C., Section 166(d), rather than on business debts under Title 26 U.S.C., Section 166(a), 28 T.C.M. 1387, T.C. Memo 1969–274 (1969). Applying the standard promulgated by the Supreme Court in United States v. Generes, 1972,

405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62,[1] we affirm.

For the most part the operative facts are undisputed. Since 1946, Ellison Miles has been actively engaged in the oil and gas business, primarily as a drilling contractor and an independent producer and operator. Initially, he conducted his production operations as a sole proprietorship, doing business as Miles Production Company[2], and his drilling operations by means of a corporate entity, Trio Drilling Company. These operations required substantial funds. Accordingly, Miles obtained a $300,000 line of credit for his proprietorship and a $200,000 line of credit for his corporation.

In 1958, imports into the United States from Middle Eastern oil fields resulted in severe economic repercussions on domestic oil and gas operators and drilling contractors. Miles sought out alternative investments for purposes of diversification.

Prior to the tax years involved in this case, Miles had acquired financial interests in the following enterprises:

| Name | Form of Business | Percentage Interest |
|---|---|---|
| Chemical Solvent Company | Partnership | 50 |
| Taylor Motor Company | Partnership | 33⅓ |
| Universal Printing Ink Corp. | Corporation | 50 |
| Aviation News, Inc. | Corporation | 50 |
| Southwestern States General Agency | Corporation | 50 |

Miles' contribution to these enterprises appears to have been solely financial: he exercised control only as to broad policy decisions and left the actual conduct of day-to-day business to other individuals.

David John Miller, in 1958, persuaded Miles to invest in a publishing venture launched by Miller, who had obtained contracts to print dog food labels, military yearbooks and military food stamps. Projected earnings from this business were anticipated to be $500,000 per year within two years. Initially, however, the venture required substantial capital outlays to purchase the specialized printing presses required (estimated to cost $250,000 to $300,000) and to obtain a building in which to house them. It was agreed that Miles was to furnish or arrange the financing and Miller was to manage the business.

Miller Publishing Company was incorporated in December, 1958. The owners of the common stock and their respective percentage holdings were as follows: Miles, 52%; Miller, 40%; and Kenneth Carter, 8%. Miles was not an employee of the new corporation and drew no salary therefrom during its lifetime. The initial amount invested in Miller Publishing Company through common stock subscriptions by Miles, Miller and Carter came to approximately $25,000.

The first project of Miller Publishing Company requiring a substantial financial investment was the construction of a building suitable to house the printing presses. Miles decided to construct a building with sufficient floor space to house Miller Publishing Company, several of his other ventures (Miles d/b/a Miles Production Company, Trio Drilling Company and Southwestern States General Agency), and other tenants. To oversee the construction of the building, the Carter-Miles Corporation was brought into existence. This corporation was capitalized at $10,000, with Miles and Carter each owning 50% of the common stock.

Carter-Miles Corporation purchased a parcel of land for $6,430 in cash plus an unsecured promissory not in the amount of $110,000. Interim construction financing was arranged through Mercantile National Bank of Dallas, Texas. Before Mercantile extended this financing to Carter-Miles Corporation, Miles was required to guarantee personally all advancements and to offset all amounts subject to this guaranty against his line of credit otherwise available. As construction progressed, Miles' entire

---

1. Decision in this case was held in abeyance pending the Supreme Court's decision in *Generes*.

2. Miles Production Company was incorporated on September 1, 1959.

line of credit with Mercantile was committed to the project. Long-term financing was obtained from Jefferson Standard Life Insurance Company, which agreed to provide $275,000 in return for a first mortgage on the property upon the following conditions: (1) all leases were to be assigned by Carter-Miles Corporation to Jefferson Standard Life Inurance Company and (2) Miles, Carter, and Miller would personally guarantee the loan. These conditions were acceded to and the amount of the loan was later increased to $350,000.

With his then available line of credit fully exhausted in connection with the construction of the building, Miles looked to other sources for financing the necessary machinery. On July 31, 1959, First National Bank of Dallas, Texas, advanced Miller Publishing Company $125,000. To obtain these funds, Miles, Miller and Carter were required to give their personal guaranties on all loans up to $200,000.

The portions of the building designed for the printing operations were completed in late 1959 and soon thereafter Miller Publishing Company commenced its business operations. The remaining portions of the building were completed in March 1960, and a short time later Miles Production Company, Trio Drilling Company and Southwestern States General Agency became tenants. Long-term mortgage financing in the amount of $350,000 was completed upon the assignment of the leases to Jefferson Standard Life Insurance Company and the endorsement of the note by Miles, Carter and Miller. The funds obtained from Jefferson Standard Life Insurance Company were used to retire the interim financing indebtedness owing to Mercantile National Bank.

By July 3, 1960, Miller Publishing Company was in need of an additional capital transfusion in the amount of $100,000. Before making such an advance, First National Bank required Miles and Miller to execute unlimited personal guaranties of all amounts advanced to Miller Publishing Company. On or about July 12, 1960, Miles became aware that Miller Publishing Company was in "bad financial trouble" but did not know the extent of its difficulties. On July 12, 1960, he caused Miles Production Company to advance Miller Publishing Company the sum of $15,000 as an unsecured open account loan. This advance was intended to provide temporary operating funds for the completion of printing contracts then in progress.

By late July, 1960, Miles was sufficiently concerned about Miller Publishing Company's financial condition to retain an outside attorney, Mr. Daniel Ray Rogers, to represent his and Miles Production Company's interests. Rogers was requested to make a thorough analysis of Miller Publishing Company in order to determine whether it should be rehabilitated, sold or placed in bankruptcy. Over the next month, Rogers learned that Miller Publishing Company was insolvent and unable to meet its current obligations. For the succeeding two weeks unsuccessful attempts were made to sell the publishing company. On September 12, 1960, it was placed in voluntary bankruptcy.

As a result of the bankruptcy, Miles suffered the following losses (other than his equity interest in stock):

| | |
|---|---|
| Loan to Miller Publishing Co. | $27,000.00 |
| Payments to First National Bank as endorser of Miller Publishing Company notes | $248,903.23 |
| Payments to Exchange Bank & Trust Company as endorser of Miller Publishing Company notes | $7,500.00 |
| Total— | $283,403.23 |
| Less: Payments received from Trustee in Bankruptcy | (24,206.42) |
| Net Loss— | $259,196.81 |

Miles Production Company sustained a loss of $40,000, including the $15,000 advanced to Miller Publishing Company on July 12, 1960.

The Commissioner of Internal Revenue assessed the following income tax deficiencies against Miles Production and Miles individually for 1961, 1962

and 1963, with additions pursuant to Title 26 U.S.C. Section 6653(a):

| Taxpayer | Taxable Year June 30, | Deficiency | Addition |
|---|---|---|---|
| Miles Production Co. | 1961 | $ 14,747.40 | $ 737.37 |
| Ellison Miles | 1961 | 126,551.90 | 6,327.60 |
|  | 1962 | 33,672.30 | 1,683.62 |
|  | 1963 | 23,344.05 | 1,167.20 |

The United States Tax Court upheld the Commissioner's deficiency determinations and the taxpayers urge reversal on the following two grounds: (1) the Tax Court erroneously held that the bad debt loss sustained by Miles in 1961 in connection with his guaranty of Miller Publishing Company's indebtedness was deductible only as a nonbusiness bad debt; and (2) the Tax Court erroneously held that Miles Production Company did not sustain a deductible bad debt loss in its taxable year ended June 30, 1961, with respect to advances totaling $15,028.11[3] which it had made to Miller Publishing Company.

### LOSSES SUSTAINED BY TAXPAYER MILES

As noted by Mr. Justice Blackmun in his opinion for the Court in *Generes*, supra, the characterization of a bad debt loss as either "business" bad debt or "nonbusiness" bad debt may have significant income tax implications for a taxpayer:

"If the obligation was a business debt, he may use it to offset ordinary income and for carryback purposes under § 172 of the Code, 26 U.S.C. § 172. On the other hand, if the obligation is a nonbusiness debt, it is to be treated as a short-term capital loss subject to the restrictions imposed on such losses by § 166(d) (1) (B) and §§ 1211 and 1212, and its use for carryback purposes is restricted by § 172(d) (4). The debt is one or the other in its entirety, for the Code does not provide for its allocation in part to business and in part to nonbusiness." 405 U.S. at 95, 92 S.Ct. at 829, 31 L.Ed.2d at 66.

Section 1.166–5 of the Internal Revenue Regulations distinguishes between business and nonbusiness bad debts by means of the following formula:

"(b) *Nonbusiness debt defined.* For purposes of section 166 and this section, a nonbusiness debt is any debt other than—

(1) A debt which is created, or acquired, in the course of a trade or business of the taxpayer, determined without regard to the relationship of the debt to a trade or business of the taxpayer at the time when the debt becomes worthless; or

(2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

The question whether a debt is a nonbusiness debt is a question of fact in each particular case. The determination of whether the loss on a debt's becoming worthless has been incurred in a trade or business of the taxpayer shall, for this purpose, be made in substantially the same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c) (1). For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph . . ."

In Whipple v. Commissioner of Internal Revenue, 1963, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288, the Supreme Court held that a taxpayer who had provided organizational, promotional and managerial services to a corporation in which he held an 80% common stock interest was not entitled to deduct debts owing to him by the corporation as busi-

---

3. This figure represents the total of the actual amount of the funds advanced and telephone charges associated with that advance.

ness debts when they became worthless in 1953. Mr. Justice White's opinion for the Court observed:

"Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business." 373 U.S. at 202, 83 S.Ct. at 1174, 10 L.Ed.2d at 294.

The following sentence from the *Whipple* decision proved to be of critical importance in the subsequent development of the federal income tax jurisprudence in the bad debt area:

"Moreover, there is no proof (which might be difficult to furnish where the taxpayer is the sole or dominant stockholder) that the loan was necessary to keep his job or was otherwise proximately related to maintaining his trade or business as an employee." 373 U.S. at 204, 83 S.Ct. at 1175, 10 L.Ed.2d at 295.

Relying upon this sentence, it became common practice for corporate investors to have themselves listed as employees of

the debtor corporations or to have the corporate minutes or other records reflect that loans to the corporations by the stockholder-taxpayers were necessary in order for the taxpayers to retain their positions as employees. In response to this development, the several Courts of Appeals developed two tests to determine the "proximate relationship" (or its absence) between a taxpayer's trade or business and his extension of credit to the concern in which he holds ownership interest. The Seventh Circuit, in Niblock v. Commissioner of Internal Revenue, 1969, 417 F.2d 1185, and Chief Judge Lumbard, separately concurring in Weddle v. Commissioner of Internal Revenue, 2 Cir. 1963, 325 F.2d 849, 852, took the position that in order for the worthless debts in question to be characterized as "business" debts, the taxpayer's "dominant" motivation in extending credit must have been that of protecting his or maintaining his trade or business as an employee. The Second Circuit in *Weddle*, supra, the Ninth Circuit in Lundgren v. C. I. R., 1967, 376 F.2d 623, and the Fifth Circuit in United States v. Generes, 1970, 427 F.2d 279, adopted the less stringent standard of "significant" motivation. In reversing the Fifth Circuit's decision in *Generes* the Supreme Court adopted the "dominant" motivation test:

"We conclude that in determining whether a bad debt has a 'proximate' relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient." 405 U.S. at 103, 92 S.Ct. at 833, 31 L.Ed.2d at 70.

It is clear that Judge Dawson of the Tax Court accurately predicted the course of the income tax law's development in the bad debt area and that, contrary to the position of the taxpayers, he applied a "dominant" motivation test to the facts of this case.

■ Section 7482 of the Code, Title 26 U.S.C., § 7482, provides that the

Courts of Appeals shall have exclusive jurisdiction to review the decisions of the Tax Court ". . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury". Evaluating the Tax Court's findings and conclusions under the "clearly erroneous" standard of Rule 52(a), Federal Rules of Civil Procedure, we perceive no reason for disturbing that tribunal's findings of fact and the factual inferences it drew therefrom. See Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L. Ed.2d 1218, 1228. Without doubt and without real dispute in the record, Miles' dominant and primary motivation in advancing funds to the Miller Publishing Company was that of an investor and not that of an employee or one engaged in a trade or business.

■ We reject the suggestion, advanced by taxpayer (by a memorandum filed since *Generes* was decided), that we should remand this case to the Tax Court after outlining standards of proof to be followed in the light of *Generes*, noting that the Supreme Court reversed and rendered *Generes* on the record before it instead of remanding for another jury trial. 405 U.S. at page 93, 92 S.Ct. 827, 31 L.Ed.2d at 62. We hold that the Tax Court did not err in ruling that the bad debt loss sustained by Miles in 1961 in connection with his guaranty of Miller Publishing Company's indebtedness was deductible only as a nonbusiness bad debt.

### *LOSSES SUSTAINED BY TAX-PAYER MILES PRODUCTION COMPANY*

■ As related earlier in this opinion, on July 12, 1960, Miles caused Miles Production Company to advance to Miller Publishing Company the sum of $15,000 as an unsecured open account loan. The Tax Court held that Miles Production Company, having no investment interest in Miller Publishing Company, would not have advanced those funds but for the personal wishes of Miles. It found that

Miles Production Company, in advancing the funds, had no reasonable expectation of repayment by the financially distressed publishing company. Accordingly, the Tax Court concluded that the advance represented a capital contribution and did not qualify as a bona fide loan under § 166 of the Code, Title 26 U.S.C., § 166. See Road Materials, Inc. v. C.I.R., 4 Cir. 1969, 407 F.2d 1121.

Reviewing the Tax Court's factual finding under the "clearly erroneous" standard, we uphold its determination that, for federal income tax purposes, the advance did not qualify as an extension of credit under § 166.

The judgment of the Tax Court is, in all respects,

Affirmed.