FIELD & COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
A. H. FIELD and O. B. FIELD, Petitioners v. COMMISSION OF REVENUE, Respondent
Field & Co. v. Commissioner
Docket Nos. 6452-70 and 6453-70.
United States Tax Court
T.C. Memo 1974-25; 1974 Tax Ct. Memo LEXIS 292; 33 T.C.M. (CCH) 115; T.C.M. (RIA) 74025; January 30, 1974, Filed. *292 1. Individual petitioner guaranteed loans and leases for a subsidiary of a wholly-owned corporation. When the subsidiary went bankrupt petitioner was required to discharge the obligations which he had guaranteed. Held: The guarantees made by petitioner were not proximately related to petitioner's trade or business and are, therefore, deductible only as nonbusiness bad debts under section 166(d).
2. Corporate petitioner, which is wholly-owned by the individual petitioner, made certain advances to its subsidiary. Held: At the times the advances were made, corporate petitioner had no reasonable expectation of repayment. Therefore, the advances were not loans but contributions to capital. Consequently, corporate petitioner is not entitled to a bad debt deduction.
3. Held: Items of income should be included in gross income. They should not be set off against deductions or potential deductions prior to inclusion in gross income. 2 George D. Hovey, for the petitioners.
Frank D. Armstrong, Jr., for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION
IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Year
Deficiency
Addition to Tax Sec. 6651(a) [1] *293 Docket No. 6452-70
8-31-66
$1,159.25
$115.93 [2]
8-31-67
97.80 Docket No. 6453-70
12-31-64
$2,316.02
12-31-65
5,101.91
12-31-66
2,376.94
12-31-67
3,867.19
The taxable years 1964, 1965 and 1966 are involved because of the carryback provisions of the Internal Revenue Code.
The issues for decision herein are as follows:
1. Whether A. H. and Olivia B. Field are entitled to a business bad debt deduction or a nonbusiness bad debt deduction; [3] 3 2. Whether Field & Company is entitled to a business bad debt deduction; and
3. whether Field & Company is entitled to offset items of income against an alleged business bad debt rather than taking such items directly into gross income.
FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly.
A. H. Field and Olivia B. Field, residents of Hickory, N.C., filed joint Federal income tax returns for the taxable years 1964 through 1967 with the district director of internal revenue, Greensboro, N.C. Since Olivia is a party to this action only because she filed joint income tax returns with her husband, only A. H. Field will *294 sometimes hereinafter be referred to as petitioner.
Field & Company (the corporate petitioner) is a corporation organized under the laws of North Carolina. For the fiscal years ended August 31, 1959, to August 31, 1967, inclusive, it filed its corporate income tax returns with the district director of internal revenue, Greensboro, N.C.
At all times pertinent, petitioner was president of the corporate petitioner, Field Financial Corporation, Inc. (formerly F & F Finance Company, Inc.) and Field Insurance Agency, Inc. (Insurance) all of Hickory, N.C. He did not receive a salary directly from the latter two corporations. 4 Field Financial Corporation, Inc. (Financial) and Insurance paid the corporate petitioner for management services which he provided to them and in turn the corporate petitioner paid his salary.
Petitioner incorporated F & F ?inance Company, Inc. (F&F) on June 3, 1944, with an original investment of $12,500. F&F WAS the parent of several consumer credit loan companies located in various cities throughout North Carolina. On June 28, 1962, the name of F&F was changed to Field Financial Corporation, Inc. For the first 14 years of its existence Financial was wholly owned *295 by petitioner, but in 1958 he began trading Financial stock on the over-the-counter market. Through public sales petitioner's ownership of stock outstanding was reduced from 100 percent to 30 percent. During the years before the Court petitioner's ownership remained at approximately 30 percent.
During 1962 the stock of Financial fluctuated in worth between 15 cents a share and 80 cents a share. In subsequent years the value of the Financial stock declined below 15 cents a share.
For the years 1962 and 1963 the balance sheets of Financial showed the following with regard to stockholder's equity: 5 June 30, 1962 Capital Stock: Preferred - $50 par value, 6% Cumulative Convertible, Authorized - 4,000 shares Issued - 444 shares
$22,200.00
Common - $.50 par value Authorized - 1,500,000 shares Issued - 756,209 shares
378,104.50
Capital Paid in Excess of Par Value of Shares Sold
48,506.15
Deficit
(143,525.79)
Total
$305,284.86
Less, Preferred Stock in Treasury, 120 shares, at cost
(6,090.00)
Total Stockholders' Equity
$299,194.86 June 30, 1963
Capital Stock: Preferred - $50 Par Value, 6% Cumulative Convertible, Authorized - 4,000 shares Issued - 1,316 shares
$ 65,800.00
Common - $.50 Par Value Authorized - 1,500,000 shares Issued - 756,953 shares
378,476.50
Capital Paid in Excess of Par Value of Shares Sold
54,040.57
Deficit
(146,852.48)
Total
$351,464.59
Less, Preferred Stock in Treasury, 120 shares, at cost
(6,090.00)
Total Stockholders' Equity
$345,374.59
*296 For the years 1960 through 1965 Financial reported its net worth as follows: 6 Taxable Year Ended June 30
Amount 1960
$248,519.39
1961
516,960.48
1962
299,194.86
1963
345,374.59
1964
308,982.35
1965
(293,881.90)
The predecessor of the corporate petitioner was incorporated by Mr. Field and two other individuals on August 26, 1946. Subsequently, petitioner acquired all stock of the corporation and changed its name to Field & Company. During the years in question petitioner continued to own all stock of the corporate petitioner.
Field & Company was in the insurance and real estate business. It was also in the business of providing management services and a significant portion of the corporate petitioner's income came from management fees. Although the corporate income tax returns for the years before the Court do not specify the source of the corporation's income, the returns for the fiscal years ending 1959 through 1961 indicate the following: Year
Total Income Before Expense
Clerical Income Paid by Other Companies 1959
$ 84,673.35
$49,769.11
1960
74,296.20
45,188.65
1961
107,966.94
46,021.76 Field Insurance Agency, Inc., was incorporated on 7 October 1, 1946. At the time of incorporation petitioner *297 was the sole shareholder with an original investment of $3,300. During the years 1962 through 1964, however, all the outstanding capital stock was owned by Financial.
On August 27, 1958, Coffee Break Sales and Service, Inc. (Coffee Break) was incorpated. Coffee Break came into existence as a result of a merger between Charlotte Coffee Quick Distributing Company and Coffee Break Sales and Service, Inc. Coffee Break was engaged in the business of selling coffee and candy in vending machines.
At the time Coffee Break came into existence neither petitioner nor any of the Field corporations had a financial interest in Coffee Break. Coffee Break, however, needed financing and in 1960 ?&F, THROUGH ONE OF ITS SUBSIDIARIES, FULFILLED that need.
In the latter part of 1960, Coffee Break experienced financial difficulties. Accounts payable and taxes became overdue in the approximate amount of $10,000. Furthermore, Coffee Break was unable to make interest payments due to Peoples Bank of Catawba on a $10,000 note.
Petitioner recommended a course of action designed to alleviate Coffee Break's problems. He assumed the note and offered to be responsible for the other obligations. In addition, he *298 proposed that the Coffee Break shareholders exchange their stock for F&F STOCK owned by Field & Company. 8 The exchange took place on January 5, 1961, and as a result the corporate petitioner acquired 57 percent of the outstanding stock of Coffee Break. Petitioner took control of Coffee Break to protect his investments.
In 1962 Coffee Break needed additional money, but it was unable to obtain a loan.
Petitioner realized that to enable Coffee Break to procure the needed funds he would have to be personally responsible for any loans which Coffee Break might obtain. As a result, on October 1, 1962, Financial and petitioner personally guaranteed a loan made by Charleston Capital Corporation to Coffee Break in the amount of $60,000. On December 14, 1962, petitioner personally guaranteed a loan made by Catawba Capital Corporation in the amount of $25,000.
Furthermore, Coffee Break needed vending machines for its business. On September 30, 1963, Financial executed a lease agreement with Rochester Capital Leasing Corporation to provide vending machines to Coffee Break. In connection therewith, petitioner executed a document designated "Personal Guarantee." On March 15, 1964, Coffee Break *299 executed two vending machine leases with Equitable Leasing Corporation. In connection with those leases petitioner executed two more "Personal Guarantees."
During 1964 Coffee Break's corporate existence came to 9 an end. Its assets were seized by creditors, thus causing a cessation of operations on June 30, 1964. On December 18, 1964, Coffee Break's corporate charter was suspended by the State of North Carolina for failure to pay its franchise tax.
Coffee Break suffered net operating losses in each year of its existence.
On November 23, 1964, the shareholders of Financial voted to place the corporation and its subsidiaries in the hands of a trustee committee for the purpose of marshalling assets. Financial ceased business operations and became a dormant corporation.
The loan and lease agreements entered into with Charleston Capital Corporation, Catawba Capital Corporation, Equitable Leasing Corporation and Rochester Capital Leasing Corporation were not fulfilled by the principal obligors (Coffee Break and Financial) and judgments were obtained against petitioner as follows: Name
Date of Judgment
Amount of Judgment Charleston Capital Corporation
March 4, 1965
$ 56,110.00
Catawba Capital Corporation
May 31, 1965
21,500.00
Equitable Leasing Corporation
September 15, 1966
16,294.02
Rochester Capital Leasing Corporation
January 12, 1967
30,320.00
Petitioner *300 negotiated with the four judgment creditors and in 1967 settled the judgments as shown in the following schedule: 10 Name
Amount of Judgment Paid by Petitioner Charleston Capital Corporation
$49,500
Catawba Capital Corporation
19,884
Equitable Leasing Corporation
14,355
Rochester Capital Leasing Corporation
6,800
Total
$90,539
The corporate petitioner made advances to Coffee Break o The corporate petitioner made advances to Coffee Break of $45,032.67 and of that amount $10,347.09 was repaid. A schedule which reflects the dates and amounts of advances and repayments is as follows: Date
Debit
Credit
Balance Due December 1962
$7,500.00 [4]
$ 7,500.00
November 1963
3,000.00
10,500.00
December 1963
9,370.67
19,870.67
April 1964
$10,347.09
9,523.58
August 1964
12,000.00
21,523.58
December 1965
13,048.00
34,571.58
114.00 [4]
34,685.58 11 In regard to the advances made by the corporate petitioner, *301 petitioner did not know whether Coffee Break was charged interest nor did he know whether the advances were secured by notes or other security.
Although the corporate petitioner determined that it had a bad debt of $34,689.54, it made further adjustments before arriving at the amount which it deducted as a bad debt for Federal income tax purposes. During 1964 Mr. Bryant examined the books of Field & Company and found a payable to Field Credit Company in the amount of $647.27. Field Credit Company, however, was no longer in existence. As a result, Mr. Bryant took the item into income by crediting it against the bad debt thus reducing the bad debt. In addition, Mr. Bryant found a payable to Resolute Insurance Company of $2,528.89. He determined, however, that the payable was not actually owed. He, therefore, took that item into income by crediting it against the bad debt. He also credited another $720 from a reserve for insurance claims. As a result of the credits he determined that the bad debt deduction should be $30,572.71.
OPINION
The issue of whether petitioner suffered a business bad debt or nonbusiness bad debt is a question of fact to be determined in light of all facts and *302 circumstances. Miles 12 Production Company v. Commissioner, 457 F.2d 1150 (C.A. 5, 1972), affirming a Memorandum Opinion of this Court; Stuart M. Sales, 37 T.C. 576 (1961); section 1.166-5(b), Income Tax Regs.
The issue's resolution is important for the taxpayer. If the obligation was a business debt, he may use it to offset ordinary income and for carryback purposes under § 172 of the Code, 26 U.S.C. § 172. On the other hand, if the obligation is a nonbusiness debt, it is to be treated as a short-term capital loss subject to the restrictions imposed on such losses by § 166(d) (1) (B) and §§ 1211 and 1212, and its use for carryback purposes is restricted by § 172(d) (4). The debt is one or the other in its entirety, for the Code does not provide for its allocation in part to business and in part to nonbusiness. [United States v. Generes, 405 U.S. 93, 95-96 (1972).]
Because the character of a bad debt is determined by its relationship to the petitioner's business, we must first determine the nature of petitioner's trade or business. We note that petitioner does not claim to have been in the business of making loans. In addition, there is no contention that petitioner was in the *303 separate business of promoting, financing or organizing corporations.
Petitioner does assert and respondent agrees that being a corporate executive is considered a trade or business. Furthermore, the parties are in accord that petitioner was an executive of the corporate petitioner.
The parties disagree, however, on whether there was a relationship between petitioner's job with Field & Company and the loans which he guaranteed for Coffee Break. Petitioner 13 seeks to establish such a relationship on the basis of what might be called a domino theory. He contends that the corporate petitioner, his employer, received a substantial part of its income from Financial and Insurance. He then asserts that without the loans which he guaranteed, Coffee Break would have failed and that such failure, in turn, would have caused the bankruptcy of Financial and its wholly-owned subsidiary, Insurance. Petitioner finally argues that if Financial and Insurance had gone into bankruptcy, he would have lost his job and at the age of 57 he would have trouble finding a new job. He concludes, therefore, that there was a relationship between his job and the guarantees.
In turn, respondent questions: (1) *304 whether the corporate petitioner did in fact receive income from Financial and Insurance; and, (2) whether petitioner would have lost his job even if Coffee Break, Financial and Insurance had gone bankrupt, since he was the sole shareholder of Field & Company.
Although the connection is indirect, we are convinced that there was a relationship between petitioner's job and the guarantees. The records of Field & Company do not indicate the sources of its income for the years in question, but the balance sheets for the taxable years 1959 through 1961 show substantial entries for "Clerical Income Paid by Other Companies." Consequently, the corporate petitioner 14 earned a large part of its income by sharing its employees with other companies. Because of the close relations among the various Field corporations, we infer that Financial and Insurance were the companies referred to in the entries. We, therefore, believe that Field & Company did receive a sizable amount of its income from Financial and Insurance during the years in question. Consequently, if those two companies went bankrupt, it would have reduced the corporate petitioner's income significantly. As such, the funds available *305 from which to pay petitioner's salary would have been diminished considerably. Although petitioner would not have lost his job if he had not guaranteed the loans, his salary would have been so reduced that his job could have become a job in name only. Accordingly, there was a relationship between the guarantees and petitioner's job.
The issue remains, however, whether there was a proximate relationship between the guarantees and petitioner's job. In United States v. Generes, 405 U.S. 93 (1972), as here, the issue was whether the bad debt had a proximate relation to the taxpayer's business as required by the regulations promulgated under section 166. The Supreme Court held that it did not and in so doing concluded:
that in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, * * * the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. [United States v. Generes, supra at 103.] 15 Petitioner must, therefore, prove that the business of being a corporate executive was his dominant motive for guaranteeing the loans. Conversely, when petitioner is both an employee *306 and an investor, as in the present case, it must be clear from the record that petitioner's primary motive in guaranteeing the loan was not investment related. Oddee Smith, 55 T.C. 260 (1970), remanded for consideration in light of Generes at 457 F.2d 797 (C.A. 5, 1972); opinion on remand 60 T.C. 316 (1973).
In an effort to establish business as his dominant motive petitioner testified that preservation of his job was his primary motive in making the guarantees and he contends that an inference of business motiviation should be made from a comparison of petitioner's salary with his original investment in Insurance and Financial.
Because we believe the argument for the inference to be more important, we shall consider it first.Petitioner stresses that his original investment in Financial and Insurance was less than $20,000. Petitioner next contends that it would be inconceivable for him to guarantee loans and leases of $124,000 to protect an investment of less than $20,000. It makes more sense, says petitioner, for him to risk that amount to protect his salary which averaged $25,000 annually for the years 1961 through 1964. He contends, therefore, that we should infer business as *307 his dominant motive. 16 Respondent counters petitioner's argument with the assertion that any comparison between petitioner's salary and his investment should be made on the basis of the book value of the investment at the time the guarantees were made.
Both parties feel that a comparison of petitioner's salary with his investment is relevant to our inquiry. They obviously know that in Generes the the Supreme Court made a similar comparison in determining the taxpayer's dominant motive. Although, that Court used the taxpayer's original investment for its analysis, it did so because the actual value of the investment was unknown. United States v. Generes, supra.
In the present case we are able to determine the approximate value of petitioner's investment at the time he guaranteed the loans.
Valuation * * * is necessarily an approximation * * *. It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence. * * * [Anderson v. Commissioner, 250 F.2d 242, 249 (C.A. 5, 1957), certiorari denied 356 U.S. 950 (1958).]
Alvary v. United States, 302 F.2d 790, 795 *308 (C.A. 2, 1962).Taken together, the 1962 and 1963 balance sheets of Financial indicate that there were 756,953 shares of Financial common stock outstanding and 1,316 shares of Financial preferred outstanding during 1962. The parties agree that petitioner owned 30 percent of the outstanding shares of Financial during the years in question. Accordingly, petitioner owned 17 approximately 227,086 shares of common stock during 1962. [5] Petitioner testified that during 1962 the stock of Financial was worth from 15 cents to 80 cents per share. Although it is not entirely clear, we assume he was referring to common stock. Consequently, the value of petitioner's investment in Financial for 1962 averaged about $95,000. [6]
For petitioner to prevail he must prove that business was his dominate motive for guaranteeing the loans and leases. It seems to us, however, *309 that petitioner was motivated by equal concerns, one for his investment of $95,000 and the other for his salary which averaged $25,000 annually. [7]
Of course, we have only considered the value of petitioner's investment for 1962, the year in which the largest guarantees were made. Petitioner also made guarantees in 1963 and 1964, years when the value of the Financial stock had declined. In 1963 and 1964, however, the guarantees which petitioner made in 1962 were a consideration. Petitioner does not claim to have been in the business of guaranteeing loans; therefore, protection of the 1962 guarantees would be 18 a nonbusiness motivation. The guarantees from 1962 were for a total of $85,000. When that amount is added to the value of petitioner's investment, even though decreased, the inference is that it was highly unlikely that business could have been petitioner's dominant motivation in making the guarantees in 1963 and 1964.
The only evidence favorable to petitioner is his testimony. All other evidence indicates that petitioner's investment *310 and business interests were so interwoven that we could hardly designate business as petitioner's dominant motive in guaranteeing the loans and leases. This is particularly true in light of the fact that a cautious approach should be taken in allowing deductions for business bad debts. Whipple v. Commissioner, 373 U.S. 193 (1963). See also Generes. Accordingly, petitioner did not suffer a business bad debt.
The next issue to be considered is the nature of the advances which Field & Company made to Coffee Break. If the advances were loans, then the corporate petitioner would have a business bad debt under section 166. If the advances were contributions to capital, then the corporate petitioner will not be entitlted to a deduction for a bad debt.
The nature of the advances, whether loans or capital, is a question of fact, with the burden of proof on the corporate petitioner to establish its assertion of loans. Gilbert v. Commissioner, 262 F.2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court, certiorari 19 denied 359 U.S. 1002 (1959). In determining whether a corporate petitioner has borne the burden of proof, dealings between it and related corporations should be subject *311 to particularly close scrutiny. Cuyuna Realty Company v. United States, 382 F.2d 298 (Ct. C1. 1967).
To constitute a valid loan, money must be advanced with reasonable expectation of repayment. Litton Business Systems, Inc., 61 T.C. (December 26, 1973); C. M. Gooch Lumber Sales Co., 49 T.C. 649 (1968), remanded for entry of decision in accordance with compromise agreement of the parties, 406 F.2d 290 (C.A. 6, 1969); Miles Production Company v. Commissioner, supra.In determining whether such expectation could reasonably exist, prior cases have cited various factors to be considered. See Road Materials, Inc. v. Commissioner, 407 F.2d 1121 (C.A. 4, 1969).[8] Ultimately, however, the question depends upon the particular facts and circumstances of each case. C.M. Gooch Lumber Sales Co., supra.
In resolving this question we have considered no single factor as controlling. We have noted that petitioner was unable to recall whether interest was charged or whether the advances were secured. No evidence was presented, moreover, with respect to maturity dates. The record which was 20 established convinces us that Coffee Break was *312 so financially troubled that the corporate petitioner could not have reasonably expected repayment of the advances and, therefore, they were not loans. The fact that part of the advances were later repaid is not controlling because our determination is to be made on the basis of the economic realities as they existed at the time that the advances were made. See C. M. Gooch Lumber Sales Co., supra. The earliest advance by the corporate petitioner was made in December 1962. Two years earlier, in the latter part of 1960, Coffee Break had experienced financial difficulties of such a nature that it could not pay its taxes, accounts payable or interest due on a note from Catawba Capital Corporation. In 1962, moreover, Coffee Break needed additional money, but it was unable to obtain funds on its own. As a result, Mr. Field guaranteed loans of $60,000 and $25,000 in October and December 1962. Therefore, at the time that the corporate petitioner advanced the first $7,500 in December 1962 Coffee Break was a corporation that had shown no profit in almost four years of existence, yet it owed at least $60,000 and perhaps $85,000 on loans guaranteed by Mr. Field. Under those circumstances *313 it would not have been reasonable for Field & Company to have expected repayment of even the first advance made in December 1962.
It is even less likely that the later advances were 21 loans. By the time the next advances were made in November and December 1963 the obligation with Rochester Capital Leasing Corporation existed in addition to the other obligations. Coffee Break's assets were seized by its creditors in June 1964; therefore, even the most optimistic of optimists would have realized that there was little likelihood that an advance in June 1964 would be repaid. On December 18, 1964, Coffee Break's corporate charter was suspended for failure to pay taxes. One year later, in December 1965 the final advance was made. We see little need for comment with regard to the character of that advance.
Accordingly, the advances from Field & Company to Coffee Break were contributions to capital and not loans. As a result the corporate petitioner was not entitled to a bad debt deduction.
We next turn to the issue of the treatment of the items which the corporate petitioner credited against its alleged bad debt deduction. The parties apparently agree that the items should have been taken *314 into income, but they disagree as to the way in which the items should be taken into account. The corporate petitioner contends that the items should not have been included in gross income but should have been credited against its bad debt involving advances to Coffee Break thus reducing the amount of the bad debt deduction. The respondent contends that the items should be included in 22 gross income and not used as a direct offset against the alleged bad debt deduction.
We agree with respondent. First, we have concluded that Field & Company did not have a bad debt; therefore, a bad debt did not exist against which the items could be offset. Secondly, under section 61(a) all income from whatever source derived is to be included in gross income. Therefore, respondent is correct that the items should have been included in gross income.
Decisions will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.
2. The addition to tax is, apparently, not in dispute.↩
3. The resolution of this issue also determines whether the losses should be carried forward under sec. 1212(b) or carried back under sec. 172↩.
4. Prior to trial the parties agreed that the corporate petitioner had made advances to Coffee Break of $37,418.67. During the trial, however, evidence was presented that the advance of $7,500 and the payment by Field & Company for Coffee Break of hospital premiums of $114 had been overlooked when the initial amount was agreed upon.↩
5. We do not know what preferred stock petitioner owned during 1962.↩
6. Although Financial's net worth as contained on its balance sheet does not necessarily reflect true value (see Washington Shirt Co., 13 B.T.A. 1360↩ (1928)), it is interesting to note that Financial's net worth for 1962 was $299,194.86 and 30 percent of that is roughly $90,000.
7. It should be noted that the investment was in after-tax dollars whereas the salary was in pre-tax dollars. See United States v. Generes, supra.↩
8. An appeal in this case would be to the Fourth Circuit.↩