DANIEL J. HALPERN and MADELYN HALPERN, petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; NANCY J. McDEVITT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Halpern v. Commissioner
Docket Nos. 11954-78, 12035-78
United States Tax Court
T.C. Memo 1982-31; 1982 Tax Ct. Memo LEXIS 715; 43 T.C.M. (CCH) 346; T.C.M. (RIA) 82031; January 25, 1982. Moe D. Karash, for the petitioners. Ellis L. Reemer and Karen Martino, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: In these consolidated cases, respondent determined a deficiency of $ 12,994.55 in petitioners Daniel J. and Madelyn Halpern's 1974 Federal income tax and a deficiency of $ 2,734.08 in petitioner MdDevitt's 1974 Federal income tax. Concessions having been made by the parties, the issues remaining for decision are: (1) whether petitioners' payments on their guarantee of H.M. & A's corporate debt constituted a business or nonbusiness bad debt loss under section 166, [1] and (2) whether petitioner Halpern received constructive dividends from H.M. & A during 1974 in the amounts determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners Danial J. Halpern (Halpern) and Madelyn Halpern filed their joint Federal income tax returns for the taxable year *718 1974 with the Internal Revenue Service Center, Holtsville, New York. Petitioners Halpern resided in New Hyde Park, New York at the time they filed their petition in the instant case. Petitioner Nancy J. McDevitt (McDevitt) filed a Federal income tax return for the taxable year 1974 with the Internal Revenue Service Center, Holtsville, New York. Petitioner McDevitt resided in New York, New York, at the time she filed her petition herein. Facts re Issue 1
At all times relevant to this proceeding, Halpern and McDevitt were co-owners of Halpern, McDevitt & Associates, Inc. (H.M. & A) with Halpern owning 70 percent of H.M. & A's stock and McDevitt owning 30 percent. During the fiscal year 1974, Halpern served as president of H.M. & A and McDevitt as vice-president. H.M. & A was a service corporation incorporated in 1968 and was involved in creating and placing television advertisements, creating television shows, and sales promotion. In creating the advertisements, Halpern would write the words of the advertisements while McDevitt would develop the visual portion. Sales promotion involved the distribution of their material through the mails or through hand-outs. *719 Halpern's initial capital contribution in H.M. & A was $ 2,100 and McDevitt's was $ 900, for total capital contributions of $ 3,000. During the years ending September 30, 1971, September 30, 1972, September 30, 1973, and September 30, 1974, Halpern received salaries from H.M. & A of $ 60,000, $ 60,000, $ 76,000, and $ 65,000, respectively. During the same years McDevitt received salaries from H.M. & A of $ 30,000, $ 30,000, $ 29,000 and $ 22,500, respectively. H.M. & A's gross income for its 1971, 1972, 1973, and 1974 fiscal years was $ 1,584,978, $ 1,531,926, $ 2,435,263 and $ 1,073,905, respectively. The corporation's taxable income for its 1971 fiscal year was $ 24,449. On June 21, 1971, Halpern and McDevitt each signed guarantees for Chemical Bank, guaranteeing any loans Chemical Bank might make to H.M. & A. In 1971, shortly after the execution of such guarantees, H.M. & A borrowed from Chemical Bank $ 10,000 to $ 12,000 subject to the guarantees. The money borrowed was used to purchase equipment needed for the business. Capricorn Syndication Sales, Inc. (Capricorn) was a subsidiary of H.M. & A. On July 11, 1973, H.M. & A executed a contract on behalf of Capricorn *720 with N.F.L. Films, Inc. regarding the distribution of weekly football programs during the 1973-1974 football season. The purchase of N.F.L. programs represented the first time H.M. & A ever purchased a pre-existing show for syndication for the purpose of selling advertising thereon. As a result of the above contract, H.M. & A had Chemical Bank issue an irrevocable letter of credit in the amount of $ 200,000 to N.F.L. Films, Inc. dated September 24, 1973. On September 18, 1973, H.M. & A gave three notes to N.F.L. Films, Inc., each for $ 20,000 and due on March 15, 1974, April 15, 1974, and May 15, 1974, respectively. On August 27, 1974, H.M. & A executed a promissory note to Chemical Bank for $ 100,000 which was due on November 26, 1974. The $ 100,000 was repaid as follows: October 9, 1974
$ 588.80
October 11, 1974
30,000.00
November 26, 1974
419.89
September 10, 1975
68,991.31
$ 100,000.00
The October 11, 1974 payment of $ 30,000 and the September 10, 1975 payment of $ 68,991.31 were made by Halpern and McDevitt under the terms of their original guarantees to Chemical Bank. The $ 30,000 payment on October 11, 1974, was made by cashing certain United *721 States Treasury Bills due on October 10, 1974, with Halpern paying $ 13,000 to Chemical Bank and McDevitt paying $ 17,000. On September 9, 1974, H.M. & A executed an assignment for the benefit of creditors and ceased business operations. Halpern and McDevitt were also co-owners of another corporation in 1974, Dawn Advertising & Sales Promotions, Inc. (Dawn), with Halpern owning 70 percent of the stock and McDevitt 30 percent of the stock. Dawn was incorporated on October 30, 1967 and was engaged in advertising and sales promotions. Dawn, however, was not engaged in television advertising. In creating the advertisements and doing the sales promotion for Dawn, Halpern was again the one who "thought of the words" while McDevitt "thought of the pictures." Halpern and McDevitt were employed by Dawn during 1971 and continued such employment after H.M. & A ceased operations. Petitioners' dominant purpose in executing the guarantees was related to their employment with H.M. & A. Facts re Issue 2
In his notice of deficiency for 1974, respondent determined that certain payments were made by H.M. & A to petitioner Halpern for his personal benefit and asserted dividend income *722 in the following amounts: 1. Personal use of rented automobile and
fuel purchases for the period from
1/1/74 to 9/30/74
$ 3,154,77 2. Personal travel expense
142.49 3. Underpayment of business expense
reimbursements
(44.41)
4. Personal loan which was forgiven--
amount was reclassified as travel and
entertainment expenses and
unsubstantiated
6,706,06 Less: Dividend exclusion
(100.00)
Total
$ 9,858.91 H.M. & A's balance sheet as of September 30, 1973, shows retained earnings of $ 130,118 and retained earnings of $ 60,302 as of September 30, 1974. The following accounts receivable were shown on the worksheet of H.M. & A's accountant in preparing its balance sheet for the 1974 fiscal year: Due from: Dawn Advertising
$ 4,120.43
Black Beauty
49,962.89
Bullfrog Productions
9,205.48
Capricorn
200,938.96
None of these receivables were shown to be worthless as of September 30, 1974. Petitioner Halpern failed to prove that H.M. & A had earnings and profits in an amount insufficient to cover the constructive dividends which respondent attributed to Halpern. On October 29, 1973, H.M. & A executed a contract with Potamkin *723 Cadillac Leasing Corp., providing for the rental of a 1974 Cadillac for 3 years at the rate of $ 290.53 per month. In addition to the $ 290.53 monthly rental, H.M. & A paid the fuel bills for the car, which averaged $ 10 per month. The Cadillac was used by Halpern primarily to transport various clients around town. Its use was business related. On H.M. & A's assignment for the benefit of creditors, the lessee's name for the Cadillac was changed to Dawn, with Dawn making the monthly payments. H.M. & A paid $ 102 for the rental of a car during a 9-day stay by Halpern in St. Thomas, Virgin Islands, in March 1974. Halpern's activities during this trip were partially business related. In 1974, H.M. & A reclassified a total of $ 6,706.06, which had been listed on its books as a loan to Halpern, as a travel and entertainment expense. H.M. & A recorded its traveling and entertainment expenses by treating every advance for such purposes as a loan to the shareholder and upon the presentation of the necessary documentation to the corporation, such loan would then be reclassified on the corporate books as a traveling and entertainment expense. Halpern adduced no evidence regarding the *724 nature of these expenses. OPINION Issue 1. Bad Debt Deduction
Petitioners Halpern and McDevitt was both shareholders and employees of H.M. & A Corp. In 1971, Halpern and McDevitt guaranteed any loan Chemical Bank might make to H.M. & A. Subsequent to the execution of guarantees, H.M. & A entered into two loan transactions with Chemical Bank. After the corporation went bankrupt, Halpern and McDevitt repaid the loan balances under the terms of their original guarantees. The first issue we must decide is whether petitioners Halpern and McDevitt are entitled to a business or nonbusiness bad debt deduction for losses arising from their guarantee of debts of a corporation in which petitioners were both employees and investors. The parties agree that petitioners sustained a bad debt loss upon payment of their guarantee of H.M. & A's debts subsequent to its bankruptcy. See Putnam v. Commissioner, 352 U.S. 82 (1956). They disagree over characterization of the debt as a business or nonbusiness bad debt. See section 166(d)(2). [2]
*725 Petitioners argue that the loans were made in the course of their trade or business as employees of H.M. & A and that the dominant motive for their execution of the guarantees was to preserve their status as employees. They contend that without the guarantees, H.M. & A would have ceased business operations causing them to become unemployed. Respondent argues that the guarantees were undertaken to protect petitioners' investment in H.M. & A and therefore the losses occasioned by the guarantees were deductible only as a short-term capital loss. We agree with petitioners. Section 166(a) [3] allows a deduction for any debt that becomes worthless in the taxable year. However, section 166(d) provides that in the case of an individual taxpayer, section 166(a) shall not apply to a nonbusiness bad debt. Instead, the loss from a nonbusiness bad debt will be treated as a short-term capital loss. A nonbusiness bad debt is defined in section 166(d)(2) as *726 * * * a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Petitioners were both employees and shareholders of the debtor corporation. If, as petitioners assert, the claimed bad debt was proximately related to their employment at the time they signed the guarantee agreements, it would be a business bad debt. United States v. Generes, 405 U.S. 93, 101 (1972); section 1.166-5(b), Income Tax Regs. The Supreme Court held in Generes that the proper measure for determining whether a bad debt has a proximate relationship to a taxpayer's trade or business is that of dominant motivation. 405 U.S. at 103. The determination of petitioners' dominant motive is a factual inquiry and the burden of proof is on the petitioners. Smith v. Commissioner, 55 T.C. 260 (1970), remanded for reconsideration in light of United States v. Generes, supra, 457 F.2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316, 318 (1973). Petitioners *727 rely in part upon their own testimony that job security and the retention of employment were the dominant factors motivating the guarantees. We found both petitioners to be extremely credible witnesses, and their testimony is both consistent with and corroborated by factual inferences required by the record. A comparison of petitioners' substantial salaries to their relatively small investment in H.M. & A supports their claim that the guarantees were business related. On incorporation of H.M. & A in 1968, the petitioners' investment totalled $ 3,000--$ 2,100 by Halpern and $ 900 by McDevitt. Between 1971 and 1974, Halpern's salary received from H.M. & A averaged approximately $ 65,000 annually and McDevitt's approximately $ 28,000 annually, and was supplemented by noncontributory fringe benefits. This comparison strongly suggests that the testimony of both petitioners as to their dominant motivation is entirely consistent with the circumstances we confront. We believe it is entirely appropriate to base our decision as to petitioners' motivation on reasonable inferences drawn from facts that have been established by the record. Hogue v. Commissioner, 459 F.2d 932, 938 (10th Cir. 1972), *728 affg. a Memorandum Opinion of this Court; Miles Production Co. v. Commissioner, 457 F.2d 1150, 1154-1155 (5th Cir. 1972), affg. a Memorandum Opinion of this Court. The record is not as clear as we would wish concerning the value of H.M. & A when the guarantees were made or honored. The corporation was clearly enjoying some success early on, and came on increasingly hard times during the years before us, eventually failing. But the corporation's earnings were a function of the creativity and the marketability of services provided by Halpern (who "thought of the words") and McDevitt (who "thought of the pictures"). As Halpern testified, the business "only has what people have in their heads. It's an idea business. So it really has no hard value by itself. You couldn't sell it without selling me." For this reason, the major fruits of the venture were attributable to the services of Halpern and McDevitt, who were compensated accordingly. On the particular facts before us, the dominant value to petitioners of the corporation was as a vehicle through which they were marketing their talents, and the failure of the corporation to honor its commitments, service *729 its customers, and remain viable was viewed by petitioners as placing their careers in significant jeopardy, if not indefinitely, at least for a significant period of time. In short, when we "compare the risk against the potential reward" (see United States v. Generes, supra at 104), we find that petitioners' dominant motivation was proximately related to business considerations. We believe the various reasons we have given for our conclusion are fully supported by the record as a whole. We recognize that petitioners had a small investment that looked favorable early on and that a desire to protect that investment may well have been one motivating factor for the guarantee. Nevertheless, whether we characterize that motivation as marginal, substantial, or significant, it was clearly not the dominant motive on the record before us. [4]
*730 Issue 2. Constructive Dividend to Halpern
Respondent determined that certain payments were made by H.M. & A for the personal benefit of Halpern and thus charged Halpern with a constructive dividend of $ 9,958.91. Under section 61(a)(7) gross income includes the receipt of any dividend. A dividend is defined in section 316(a) as "any distribution of property made by a corporation to its shareholders * * *". There is no requirement that the dividend be formally declared or even intended by the corporation. Loftin and Woodward, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978). Accordingly, it is well-settled that the personal use of corporate property by a shareholder and expenditures made by a corporation for the personal benefit of a shareholder are constructive distributions to the shareholder in amounts equal to the fair value of the benefits involved. See Nicolls, North, Buse Co. v. Commissioner, 56 T.C. 1225, 1238 (1971); ChallengeManufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962). See also Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929). The test for constructive *731 dividend is two-fold: the corporation must have conferred a economic benefit on the shareholder without expectation of repayment, United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969), and the company-provided benefit must primarily advance the shareholder's personal interest as opposed to the business interests of the corporation. Ireland v. United States, 621 F.2d 731 (5th Cir. 1980); United States v. Gotcher, 401 F.2d 118 (5th Cir. 1968). Initially we must determine whether H.M. & A had earnings and profits in an amount sufficient to cover the constructive dividends which the Commissioner attributed to Halpern. See section 301(c), section 316. H.M. & A was organized in 1968. The record contains no evidence whatsoever as to the amount of earnings and profits of the corporation in any of the years from 1968 through 1974. The record also fails to show whether any earnings and profits of the corporation in such years were distributed. The only possible indication of H.M. & A's earnings and profits consists of a balance sheet prepared by H.M. & A's accountants for purposes of computing its 1974 tax return which showed retained *732 earnings of $ 130,118 at the close of its 1973 fiscal year and retained earnings of $ 60,302 after its 1974 fiscal year. [5] We note at the outset that a corporation's earnings and profits, computed under section 312, are not necessarily equal to its surplus or retained earnings as shown on the corporate balance sheet. See generally Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders at pp. 7-15-7-23. [6] Thus, such figures are of questionable probative value in proving the amount of accumulated earnings and profits. Nonetheless, using these retained earnings figures as a starting point, Halpern attempted to demonstrate at trial that these figures were overstated. The basis for Halpern's claim is that H.M. & A had various unrealized accounts receivable which had become worthless as of September 30, 1974 resulting in a large operating deficit for 1974. He contends that such worthlessness was not reflected in the retained earnings figures. [7] At trial, Halpern introduced a worksheet of H.M. & A's 1974 balance sheet prepared by the corporation's accounting firm which listed the following accounts receivable as assets of the corporation: *733 Due from Dawn Advertising
$ 4,120.43
Black Beauty
49,962.89
Bullfrog Productions
9,205.48
Capricorn
200,938.96
The only evidence offered regarding the worthlessness of these receivables consists of Halpern's uncorroborated testimony that these corporations were not able to repay these amounts to H.M. & A as of September 30, 1974. Dawn, a corporation owned by Halpern and McDevitt, has been in business continuously since 1967 and there is no indication from the record that the amount due from Dawn was worthless in 1974. Further, Halpern concluded that he did not know the financial condition of Black Beauty as of September 30, 1974 since he sold most of his shares in that corporation prior to that date. Additionally, while Halpern testified that Bullfrog Productions, an "inactive" corporation owned by himself and McDevitt, was unable to repay the amount due to H.M. & A, he was very hazy on certain significant corporate details. Lastly, Halpern presented no evidence whatsoever that Capricorn, a subsidiary of H.M. & A, was unable to repay the amount shown. [8]
*734 Based on the foregoing, we conclude that Halpern has failed to prove that H.M. & A did not have accumulated earnings and profits for years prior to 1974 together with available earnings and profits for 1974 sufficient to cover the amounts in question. [9]Rule 142(a), Tax Court Rules of Practice and Procedure.
We next turn to the question of whether the following amounts listed by respondent *735 in his deficiency notice were paid by H.M. & A to Halpern for his personal benefit and as such, were constructive dividends to him: Personal use of rented automobile and fuel
purchases for the period from 1/1/74 to
9/3/74
$ 3,154.77 Personal travel expense
142.49 Underpayment of business expense
reimbursement
(44.41)
Personal loan which was forgiven--amount
was reclassified as travel and entertainment
expenses and unsubstantiated
6,706.06 $ 9,958.91 Less: Dividend Exclusion
(100.00)
Total
$ 9,858.91 A. Use of Cadillac
Respondent has determined that Halpern's personal use of the Cadillac furnished him by H.M. & A resulted in a constructive dividend of $ 3,154.77. Halpern testified that he used the car exclusively for corporate business purposes, specifically for the transportation of various clients when they were in town. Halpern also testified that for such purposes the use of a company car was more economical than hiring limousines. The parties stipulated that the monthly fuel bill was approximately $ 10, and it therefore seems that very little use of the car was made. We find Halpern's testimony regarding the business use *736 of the car entirely credible. Thus, H.M. & A's payment of these expenses did not result in a constructive dividend to Halpern. B. Travel and Entertainment Expense--$ 6,706.06
This item was initially listed on the books of H.M. & A as a loan to Halpern and was later reclassified in 1974 as a travel and entertainment expense. Apparently, the method which H.M. & A used to record its traveling and entertainment expenses was to treat every advance for such purpose as a loan to the shareholder and upon the presentation of the necessary documentation to the corporation, such loan would then be reclassified on the corporate books as a traveling and entertainment expense. Respondent initially asserts that since such loan was never repaid, the corporate advance is a constructive dividend to petitioner. Halpern contends that the corporation's method of recording its expenses should not cause the corporation's payment of a legitimate business expense to result in a constructive dividend to petitioner. We feel, however, that such bookkeeping subtleties are irrelevant. The question is whether Halpern used the amount advanced for his personal benefit or for the benefit of the corporation. *737 Halpern adduced no evidence regarding these expenses. When Halpern was asked at trial what the $ 6,706.06 recorded on H.M. & A's books as travel and entertainment expense consisted of, he replied "I would imagine a lot of little bills" and when pressed for specifics, he replied further, "Well, generally speaking, I would think it consisted of client entertainment." We note that the fact that such expenditures would not meet the section 274 substantiation requirements so as to permit the corporation to deduct them does not necessarily make the payment dividend income under section 61(a)(7). Cf. Erickson v. Commissioner, 598 F.2d 525 (9th Cir. 1979), revg. on this issue a Memorandum Opinion of this Court; Ashby v. Commissioner, 50 T.C. 409, 417-418 (1968). However, the taxpayer still must present some proof as to the nature of the expense. Henry Schwartz Corp. v. Commissioner, 60 T.C. 728 (1973). This he has not done. Halpern requests that we excuse his failure to substantiate the expenses on the grounds that the corporate records are in the possession of the assignee in bankruptcy. Such cause, however, does not relieve a *738 taxpayer of his burden of proof. [10]Burnet v. Houston, 283 U.S. 223 (1931). The bare statement that the expenses were "generally speaking, for client entertainment" is insufficient. Without evidence that these expenses were for the benefit of his corporation, we hold that its payment of these expenses resulted in Halpern's receiving constructive dividends in the amount of $ 6,706.06. C. Personal Travel Expense -- $ 142.49
The category includes $ 102 paid by H.M. & A for the use of a car by Halpern in the Virgin Islands during a 9-day stay in 1974. Halpern testified that he took the trip to the Virgin Islands for the purpose of attracting new clients for the corporation's advertising business. He testified that during the trip he attempted to solicit the business of the hotels and "scuba diving places." Since we believe that part of the trip was devoted to corporate business, we find that half of the expenses constituted a constructive dividend to him. See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). *739 To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. SEC. 166, in effect during 1974, provides: (d) NONBUSINESS DEBTS.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) NONBUSINESS DEBT DEFINED.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) the debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
3. SEC. 166. BAD DEBTS (a) GENERAL RULE.-- (1) WHOLLY WORTHLESS DEBTS.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) PARTIALLY WORTHLESS DEBTS.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
4. We note here that the facts before us are wholly disparate from those present in United States v. Generes, 405 U.S. 93 (1972). In addition to the much larger investment there present (particularly in real dollars), the $ 12,000 income to Generes was relatively insignificant--both in relation to his investment and his overall income. Additionally, there were many other nonbusiness motives underlying the Generes guarantee and loan. See 405 U.S. at 106, 107↩.
5. The $ 60,302 figure on the balance sheet was arrived at by subtracting $ 69,816 which represented H.M. & A's loss for 1974 from the $ 130,118 figure. Although H.M. & A and its subsidiary, Capricorn, filed consolidated returns, Capricorn's deficit in earnings and profits may not be reflected in H.M. & A's earnings and profits, see sec. 1.1502-33(c)(4)(i)(a↩), Income Tax Regs., in the absence of an election under sec. 1.1502-33(c)(4)(iii). Such election was not filed. 6. Adjustments made to earnings and profits and retained earnings or earned surplus are frequently different. For example, stock dividends will usually reduce the corporation's earned surplus but will not have any effect on earnings and profits unless taxable under sec. 305. Sec. 1.312-1(d), Income Tax Regs.↩
7. Although Halpern does not fully develop his theory, his argument appears to be that the worthlessness of the receivables caused an operating deficit for 1974 which wiped out any earnings available for distribution during 1974. See generally Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders at pp. 7-10-11 (4th ed. 1979). However, even if such worthlessness could be established, Halpern would still have to overcome the lack of information concerning H.M. & A's accumulated earnings and profits.↩
8. We note that since H.M. & A has taken Capricorn's net operating losses into account in filing its consolidated return for the 1974 fiscal year, it is questionable whether H.M. & A would later be allowed to deduct under either sec. 165 or 166 the loss on its investment or loans to a subsidiary. Cf. Ilfeld Co. v. Hernandez, 292 U.S. 62 (1934); Edward Katzinger Co. v. Commissioner, 129 F.2d 74↩ (7th Cir. 1942).
9. A diversion of corporate funds by the dominant stockholder and officer of a corporation has been held to constitute income regardless of whether it may be classified as a dividend, and that taxability to him therefore need not turn upon the existence of corporate earnings and profits. Davis v. United States, 226 F.2d 331 (6th Cir. 1955); Leaf v. Commissioner, 33 T.C. 1093 (1960), affd. per curiam 295 F.2d 503↩ (6th Cir. 1961). Therefore, it may have been unnecessary for respondent to characterize these items as constructive dividends. However, in view of our finding that Halpern has not met his burden of proving that H.M. & A lacked sufficient earnings and profits at least equal to the amounts in question, this point need not be resolved.
10. We note that at trial, Halpern's counsel admitted that he made no attempt to obtain the corporate records and books from the assignee.↩