JACOB ABDALLA AND MARY T. ABDALLA, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1783–74.      Filed February 13, 1978.

*H. Book Hopkins,* for the petitioners.
*Eddy M. Quijano,* for the respondent.

STERRETT, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1968 in the amount of $143,895.95. Due to concessions made by the parties, four issues remain for our determination: (1) Is shareholder petitioner entitled to a deduction for a portion of the net operating losses of the two subchapter S corporations as calculated at their year ended January 31, 1967, to the extent of his stock basis and basis of indebtedness therein; (2) is petitioner entitled to a section 163 interest deduction in 1968 by reason of payments on two notes of a bankrupt corporation which petitioner had guaranteed in solido; (3) should the gain petitioner realized in liquidating two other corporations be reduced by the balance outstanding on a note executed by one of the bankrupt corporations which had been guaranteed by petitioner and the liquidated corporations; and (4) should that gain be further reduced by deficiencies owed by the liquidated corporations for which petitioner, as transferee of those corporations, is liable.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Jacob and Mary T. Abdalla, husband and wife, resided in Opelousas, La., at the time the petition herein was filed. Their joint Federal income tax return for the taxable year 1968 was filed with the District Director of Internal Revenue, Austin, Tex. Mary T. Abdalla is a party to this action only

because she joined in the filing of this return and, accordingly, Jacob Abdalla will hereinafter be referred to as petitioner.

Petitioner was the owner of 100 percent of the outstanding stock of Abdalla's Furniture, Inc. (hereinafter Furniture), a corporation organized under the laws of the State of Louisiana on December 30, 1948. As of October 25, 1966, his stock basis and basis of indebtedness in Furniture were $100,000 and $141,500, respectively. In addition, petitioner owned 1,255 of the 1,275 shares outstanding of Abdalla's Downtown Furniture, Inc. (hereinafter Downtown Furniture), a corporation organized under the laws of the State of Louisiana on November 28, 1961. His stock basis therein was $125,500 as of October 25, 1966. Both corporations used a fiscal year which ended January 31 for purposes of calculating their Federal income tax liabilities.

Furniture and Downtown Furniture timely filed a properly executed election in accordance with the provisions of sections 1371 and 1372 to be considered subchapter S corporations. During the taxable year 1967 petitioner was the president and William O. Johnson, petitioner's certified public accountant, was the secretary-treasurer of both corporations.

Petitioner was also the president, principal shareholder, and chief executive officer of three realty corporations, Park Development Corp. (hereinafter Park), Vista Development Corp. (hereinafter Vista), and Park Vista Home Owners Corp., all organized and existing under the laws of the State of Louisiana.

Furniture and Downtown Furniture were adjudicated bankrupt on October 26, 1966. The parties stipulated that petitioner's stock basis and basis of indebtedness became completely worthless on that date. For the taxable year ended January 31, 1967, Furniture and Downtown Furniture had net operating losses of $255,825 and $208,170, respectively.

Prior to the adjudication of bankruptcy petitioner had endorsed two notes of Furniture in solido. In the taxable year 1968 he paid interest thereon totaling $10,650.36. One of these notes was also endorsed by Vista and Park. They each secured their endorsement of Furniture's liability by a promissory note payable to "bearer." The promissory notes were, in turn, secured by attached collateral mortgages executed by the respective corporation.

On October 10, 1968, Park and Vista were liquidated. Petitioner computed the gain realized on liquidation without

including in his basis the balance of $107,500 remaining on the Furniture note that had been endorsed by Park and Vista.

Petitioner included a deduction for the net operating losses of Furniture and Downtown Furniture in his individual tax return filed for his taxable year ended December 31, 1967. In his individual tax return filed for his taxable year ended December 31, 1968, he included a deduction for his personal net operating loss resulting from the flow through of these corporate losses carried forward to 1968.

## OPINION

### Issue 1. Net Operating Loss

The first issue before us is whether petitioner may deduct a portion of the net operating losses of the two subchapter S corporations, as calculated at their year ended January 31, 1967, as a net operating loss carryover for his taxable year ended December 31, 1968.

At the outset we note that respondent has stipulated that the filing or nonfiling of the U.S. Corporation Income Tax Returns (Form 1120-S) for the year ended January 31, 1967, is not an issue in this case. Indeed, no question has been raised with respect to the validity of the subchapter S elections of Furniture and Downtown Furniture for the taxable years involved. Finally, neither party has attached any significance to the fact of bankruptcy except to the extent that it established worthlessness.

Section 1374, I.R.C. 1954, allows a flow through of the net operating losses of subchapter S corporations to their shareholders. The flow through results in a deduction from the shareholder's gross income for the taxable year in which the corporation's taxable year ends in an amount equal to the shareholder's pro rata share of the net operating loss.[1] A shareholder's pro rata

---

[1]SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS.

(a) GENERAL RULE.—A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.

(b) ALLOWANCE OF DEDUCTION.—Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends * * * , an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)).

(c) DETERMINATION OF SHAREHOLDER'S PORTION.—

share of that loss is based on his percentage of ownership and the number of days out of the taxable year during which he owned that percentage of the stock. Thus, if his ownership of stock is for less than the corporation's full taxable year his pro rata share is determined by cumulating the average daily losses of the corporation for his period of ownership. The deduction is limited to the adjusted basis of the shareholder's stock plus the adjusted basis of any debt the corporation owes to that shareholder, determined at the close of the corporation's taxable year or on the day before any disposition of the stock. Thus, within these prescribed limitations, petitioner, as a shareholder of two subchapter S corporations, may take advantage of their accrued net operating losses.

Petitioner asserts that his entire basis in his stock and indebtedness of these corporations was available for the purpose of calculating his share of the corporations' 1967 net operating losses and that his basis in said stock and debt should not be totally absorbed by basis adjustments arising due to any section 165 and 166 losses that emanate from the stipulated worthlessness as of October 26, 1966. He reaches this result by interpreting section 1016(a)(18)[2] to be a specific rule which excludes application of 1016(a)(1). We do not believe that the

---

(1) IN GENERAL.—For purposes of this section, a shareholder's portion of the net operating loss of an electing small business corporation is his pro rata share of the corporation's net operating loss * * * for his taxable year in which or with which the taxable year of the corporation ends. For purposes of this paragraph, a shareholder's pro rata share of the corporation's net operating loss is the sum of the portions of the corporation's daily net operating loss attributable on a pro rata basis to the shares held by him on each day of the taxable year. For purposes of the preceding sentence, the corporation's daily net operating loss is the corporation's net operating loss divided by the number of days in the taxable year.

(2) LIMITATION.—A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of—

(A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and

(B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation).

[2]SEC. 1016. ADJUSTMENTS TO BASIS.

(a) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

(1) for expenditures, receipts, losses, or other items, properly chargeable to capital account,
* * *

two paragraphs are mutually exclusive. "[T]he normal assumption is that where Congress amends only one section of a law, leaving another untouched, the two were designed to function as parts of an integrated whole. We should give each as full a play as possible." *Markham v. Cabell*, 326 U.S. 404, 411 (1945).

Paragraph (a)(18) of section 1016 refers to section 1376 which adjusts the basis for amounts treated as dividends and for net operating losses which have passed through the corporation to the shareholder.[3] These basis adjustments are necessary to integrate the unique treatment of shareholders of subchapter S corporations with the normal basis adjustments for shareholders of subchapter C corporations. It should be noted that sections 1376 and 1016(a)(18) were enacted concurrently. Section 1016(a)(1) applies to basis adjustments relating to capital loss.

To the extent applicable herein, which will be evident from the following discussions, we have no difficulty in finding paragraph 1016(a)(1) and (18) internally consistent.

Respondent contends that petitioner became entitled to section 165 worthless securities losses and a section 166 bad debt deduction on October 26, 1966, when the two corporations were adjudicated bankrupt. He concludes that such losses and deduction will absorb petitioner's basis in the two companies and leave nothing against which to offset petitioner's share of their net operating losses. A loss resulting from worthless securities is deductible as set forth in section 165(g). A debt that becomes worthless is deductible as set forth in section 166(d)(1).

---

(18) to the extent provided in section 1376 in the case of stock of, and indebtedness owing, shareholders of an electing small business corporation * * *

[3] SEC. 1376. ADJUSTMENT TO BASIS OF STOCK OF, AND INDEBTEDNESS OWING, SHAREHOLDERS.

(a) INCREASE IN BASIS OF STOCK FOR AMOUNTS TREATED AS DIVIDENDS.—The basis of a shareholder's stock in an electing small business corporation shall be increased by the amount required to be included in the gross income of such shareholder under section 1373(b), but only to the extent to which such amount is included in his gross income in his return, increased or decreased by any adjustment of such amount in any redetermination of the shareholder's tax liability.

(b) REDUCTION IN BASIS OF STOCK AND INDEBTEDNESS FOR SHAREHOLDER'S PORTION OF CORPORATION NET OPERATING LOSS.—

(1) REDUCTION IN BASIS OF STOCK.—The basis of a shareholder's stock in an electing small business corporation shall be reduced (but not below zero) by an amount equal to the amount of his portion of the corporation's net operating loss for any taxable year attributable to such stock (as determined under section 1374(c)).

(2) REDUCTION IN BASIS OF INDEBTEDNESS.—The basis of any indebtedness of an electing small business corporation to a shareholder of such corporation shall be reduced (but not below zero) by an amount equal to the amount of the shareholder's portion of the corporation's net operating loss for any taxable year (as determined under section 1374(c)), but only to the extent that such amount exceeds the adjusted basis of the stock of such corporation held by the shareholder.

It has been held that a loss within the framework of sections 165(g) and 166(d)(1) must be taken in the taxable year in which the worthlessness occurs. *Boehm v. Commissioner*, 326 U.S. 287 (1945). The taxpayer cannot juggle the year of deduction. The timing is important because the effect of the two sections is to treat the worthless asset as if it had been disposed of at a loss. Section 1.165–1(b), Income Tax Regs., refers to "identifiable events" that fix the time of loss. Section 1.166–2(a), Income Tax Regs., speaks in more general terms of "all pertinent evidence." Thus, generally there exists a factual issue as to the inception of worthlessness. Herein the stipulations resolve this issue. It was stipulated that petitioner's Furniture stock and his Downtown Furniture stock became worthless securities on October 26, 1966, the date the corporations were adjudicated bankrupt. It was also stipulated that the debt Furniture owed petitioner lost all value on that date.

The conundrum is how to apply the rule of law with respect to the timing of stock and debt losses to the instant set of facts without destroying the concept behind the subchapter S corporations that such corporations are treated as partnerships to the extent that their shareholders are to receive the benefit of any net operating losses. Petitioner's view ignores the usual rules governing the timing of deductions for worthless securities and bad debts, and respondent's view would deny a shareholder of a subchapter S corporation any deduction for its operating losses in a year of bankruptcy.

We believe that the solution to the integration of the timing of the worthlessness deductions with the tax treatment of subchapter S corporations and their net operating losses lies in the recognition of the fact that the onset of worthlessness not only constituted the event which established the worthlessness of petitioner's investment for purposes of sections 165 and 166, but that it can also fairly be treated as amounting to a sale or exchange of the stock and debt for subchapter S purposes. After all, both sections 165(g)[4] and 166(d) themselves provide that the

---

[4]Obviously we are aware that sec. 165(g) goes on to provide that the loss from the sale or exchange shall be treated as if it occurred on the last day of the taxable year. However, this language was enacted as part of the Revenue Act of 1938 and, as explained in the Senate report, for the following reason:

"Under the House bill the loss from the worthlessness of the security was considered to have been sustained on the first day of the taxpayer's taxable year. By reason of the committee amendments

fact of worthlessness shall cause the loss resulting therefrom to be treated as a loss from the sale or exchange of a capital asset. As a practical matter there can be no doubt that the onset of worthlessness constituted a disposition of petitioner's interest in the two corporations in that he lost all the economic benefits of his stock and debt ownership while that condition persisted. He could no longer vote the stock and could no longer control the corporate affairs which were in the hands of the trustee in bankruptcy. Barring a miraculous resuscitation of the corporations all that remained for petitioner after October 26, 1966, was to receive distributions, if any, from the trustee in bankruptcy, just as in the case of a sale of stock when all that remains for the seller is to receive the purchase price.

Therefore, we believe it consistent with the concept of section 1374(c) to hold that the onset of worthlessness on October 26, 1966, caused a disposition of petitioner's stock and debt interest in the bankrupt corporations, amounting to a sale or exchange, as of that date. Accordingly, he is entitled to deduct those corporate losses as if he had disposed of the stock on that date computed in accordance with section 1374(c). Thus, the limit on his losses is his adjusted basis in the respective stock and debt calculated as of October 25, 1966.

According to our computations petitioner's portion of Furniture's net operating loss cumulating between January 31, 1966, and October 26, 1966, was $187,137.73; his portion of Downtown Furniture's net operating loss for that same period was $149,887.34 calculated as follows:

re Furniture—NOL as of 1/31/67 = $255,825 ÷ by 365 = $700.89 per day × 267 days of ownership = $187,137.63.

re Downtown Furniture—NOL as of 1/31/67 = $208,170 ÷ by 365 = $570.33 × 267 = $152,278.11 × .9843 (petitioner's percent ownership) = $149,887.34.

---

relating to capital losses, this date has been changed to the last day of the taxable year. In some cases, if the first day is determinative, the effect would be to make the loss a short-term capital loss and thus deductible only against short-term gains. Fixing the date as the last day of the taxable year will, in many cases, make the loss a long-term capital loss and thus permit the application of the more favorable treatment accorded to such losses. [S. Rept. 1567, 75th Cong., 3d Sess. 14 (1938).]"

In view of its stated purpose, the language with respect to the effective date of the worthlessness is not relevant to the inquiry at hand, particularly when we have a stipulated date on which the loss at issue occurred.

Section 1374(c) limits the deduction available to him as follows:

re Furniture—stock basis of $100,000 plus basis of indebtedness of $141,500 = $241,500.

re Downtown Furniture—stock basis of $125,500 plus basis of indebtedness $0 = $125,500.

Therefore, his section 1374 net operating loss deduction in respect to Furniture is $187,137.63 and in respect to Downtown Furniture is $125,500.

This solution maintains the integrity of subchapter S without allowing a double deduction. We note that it is comparable to the treatment by consolidated groups for deductions growing out of operating losses of an affiliate and a loss on the sale of the affiliate's stock. *Ambac Industries, Inc. v. Commissioner*, 487 F.2d 463 (2d Cir. 1973).

To the extent that the discussion in *Levy v. Commissioner*, 46 T.C. 531, 538 (1966), is inconsistent with the above holding, we are no longer bound by that decision.

To make subsequent issues more understandable it is appropriate to add one caveat with respect to the net operating loss. The taxable year before the Court is 1968. The corporations' net operating loss accrued for their taxable year ended January 31, 1967. Therefore, we are considering petitioner's carryover of a net operating loss from his taxable year 1967 to his taxable year 1968.

Once the size of the net operating loss is calculated in compliance with section 1374 the amount of that loss not completely offset by petitioner's other income in that year becomes a net operating loss personal to petitioner. In other words, when petitioner individually has a net loss after the flow through of the corporations' net operating loss as limited by section 1374, the net loss of petitioner may be carried forward as dictated by section 172. *Roberts v. Commissioner*, 398 F.2d 340 (4th Cir. 1968), cert. denied 393 U.S. 936 (1968).

Of the total net operating loss of Furniture, $187,137.63 passed through the corporation to petitioner. By operation of section 1016(a)(18) his stock basis was thereby reduced to zero and his basis of indebtedness to $54,362.27 (NOL of $187,137.63 less stock basis of $100,000 = $87,137.63. Basis of indebtedness of $141,500 less NOL in excess of stock basis of $87,137.63 =

$54,362.27). Sec. 1.1376–2(b)(1), Income Tax Regs. This amount gave rise to a section 166 bad debt loss for 1966, the taxable year in which worthlessness occurred.[5] *Boehm v. Commissioner, supra.* Because the dominant motivation of petitioner in extending credit to Furniture was not to protect his trade or business of being an employee thereof but to protect his capital investment, the loss is characterized as a nonbusiness bad debt and treated under section 166(d) as a short-term capital loss. *Miles Production Co. v. Commissioner*, 457 F.2d 1150 (5th Cir. 1972). This deduction in turn caused a section 1016(a)(1) adjustment to basis as an item chargeable to the capital account. Thus, the adjustments to basis necessitated by paragraphs (a)(1) and (a)(18) of section 1016 reduced petitioner's basis to zero as of December 31, 1966.

Petitioner argues further that subsequent events gave rise to an additional flow through of these net operating losses. Petitioner bound himself as a debtor in solido on the two notes of Furniture prior to the time it was adjudicated bankrupt. Subsequent to the adjudication he paid the accrued interest on these loans. Petitioner asserts that as an obligor in solido he was liable for the obligations of Furniture, and because he was entitled to a contribution from Furniture, a further increase in his basis of indebtedness should result when the payment was made.

Respondent contends that what petitioner paid is only deductible under section 166 as a bad debt and no adjustment to basis results. We agree with respondent.

Petitioner's basis for section 1374(c) purposes, as well as Furniture's net operating loss for its taxable year ended January 31, 1967, had become fixed prior to petitioner's taxable year 1968. Subsequent events cannot affect those calculations. See *Roberts v. Commissioner, supra.*

### Issue 2. Interest Deduction

Petitioner contends that these same interest payments should result in an interest deduction under section 163. If we were to accept petitioner's arguments that this payment of interest

---

[5]We recognize that the amount of the NOL available to petitioner cannot be calculated until the corporation's taxable year ends. Until the NOL is determined the amount of basis available for a bad debt loss is an unknown. Therefore, in the factual situation before us, the bad debt loss for petitioner's 1966 taxable year could not be determined prior to the close of the corporate year ended Jan. 31, 1967.

should both increase his basis of indebtedness for purposes of calculating his portion of Furniture's net operating loss and result in a section 163 deduction, the possibility of double compensation for a single payment arises. We do not think Congress intended subchapter S to double the effect of the other provisions of the Code, but rather to make adjustments to subchapter C to reflect the realities of small business practices.

Prior to *Putnam v. Commissioner*, 352 U.S. 82 (1956), interest paid by a guarantor was deductible by him under section 163. *Sherman v. Commissioner*, 18 T.C. 746 (1952),[6] overruled by *Rushing v. Commissioner*, 58 T.C. 996 (1972). Since *Putnam*, the interpretation of this section allows an interest deduction where the taxpayer is secondarily liable only if the interest was paid in connection with a real estate mortgage and the taxpayer is the legal or equitable owner of such property. *Nelson v. Commissioner*, 281 F.2d 1 (5th Cir. 1960).

Petitioner makes two arguments in support of his application of the section 163 deduction to these payments. First, he argues that he was primarily liable as a debtor in solido under Louisiana law. Under Louisiana law the right of the third party creditor to sue petitioner for an amount he had guaranteed in solido accrued upon the maturity of the note. *Brock v. First State Bank & Trust Co.*, 187 La. 766, 175 So. 569 (1937). However, even though petitioner was liable in solido on the debt of Furniture and was thus primarily liable to the creditor, he was secondarily liable vis-a-vis Furniture. *Meadow Brook National Bank v. Recile*, 302 F. Supp. 62 (E.D. La. 1969). In other words, though the creditor was free to collect from petitioner without a prior attempt to recover amounts due from Furniture, the petitioner was only secondarily liable because he had recourse against Furniture. La. Civ. Code Ann. art. 2106 (West 1977).[7]

Second, petitioner contends that he fulfills the *Nelson* test as the legal or equitable owner of property mortgaged to secure a note. He argues that, as shareholder or as transferee of these corporations, he was the legal or equitable owner of the property mortgaged to secure a note.

The note was secured by petitioner's signature and his

---

[6]This is one of several cases cited by petitioner as authority that does not withstand scrutiny.

[7]Art. 2106. If the affair for which the debt has been contracted in solido, concerns only one of the co-obligors in solido, that one is liable for the whole debt towards the other codebtors, who, with regard to him, are considered only as his securities.

signature as president of Park and Vista. The corporations secured their endorsement by executing collateral mortgages. A collateral mortgage is one step removed from a real estate mortgage. A collateral mortgage is "designed, not to directly secure an existing debt, but to secure a mortgage note pledged as collateral security for a debt. * * * the companion promissory note is usually payable to bearer on demand." *Thrift Funds Canal, Inc. v. Foy*, 261 La. 573, 260 So.2d 628, 630 (1972). The promissory note is not the indebtedness but security pledged as collateral for the actual debt. M. Nathan and H. G. Marshall, "The Collateral Mortgage," 33 La. L. Rev. 497 (1973). Thus, the real estate, even if found to be legally or equitably owned by petitioner as a shareholder or transferee of the corporation, does not serve as collateral for the indebtedness, but as collateral for the collateral, the corporation's guarantee. This relationship is too remote to support the further expansion of section 163 that would be necessary to encompass this situation. Petitioner is limited to the relief provided by section 166.

## Issue 3. Reduction of Gain Due to Mortgage

Petitioner argues that due to the guarantee of Park and Vista on the note of Furniture their liquidation caused him to assume a liability which should reduce the gain realized on that liquidation. He cites *Lam v. Commissioner*, 8 B.T.A. 785 (1927), and Rev. Rul. 59–228, 1959–2 C.B. 59, as so holding.

Both Rev. Rul. 59–228 and *Lam* involved situations wherein the taxpayer became liable for obligations of a corporation due to its liquidation. That is, the taxpayer's total liability increased due to his assumption of the corporation's obligations.

Herein, petitioner's total liability was unaffected by his assumption of the liability of Park and Vista on Furniture's note. He was already liable on the note in his own right. A reduction of gain upon liquidation due to an obligation that does not increase the taxpayer's liability duplicates the effect of the section 166 remedy already available to compensate for the loss.

## Issue 4. Reduction of Gain Due to Deficiencies

The final issue is whether petitioner can reduce the gain realized upon liquidating Park and Vista by the amount of any deficiencies in Federal income tax owned by these two corpora-

tions that he is required to pay as transferee thereof. The actual amount of this deficiency is not before us. The liability was the subject of the case designated as docket No. 1948–74 of this Court. Petitioner fully conceded the liability on October 28, 1976, and a decision was entered by this Court on January 13, 1977, subsequent to the trial at hand.

Petitioner asserts that *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952), supports such an adjustment. We do not agree. In *Arrowsmith* the prior liquidation transactions were determinative of the *character* of the loss realized in a subsequent taxable year. There was no attempt therein to readjust the amount realized in the original transaction.

Petitioner may not recalculate the gain realized upon liquidation of Park and Vista. Instead, the taxes paid as transferee of the liquidated corporations may result in a loss in the taxable year in which they are paid. *Schneider v. Commissioner*, 65 T.C. 18 (1975); *Heiderich v. Commissioner*, 19 T.C. 382 (1952).

*Decision will be entered under Rule 155.*

Reviewed by the Court.

HALL, *J.*, dissenting: I respectfully dissent in respect to that portion of the majority's opinion which holds that petitioner is entitled to deduct only a fraction (267/365) of the operating losses incurred by his two subchapter S corporations during the taxable years ending January 31, 1967.

I would hold that as a result of the subchapter S elections, sections 1371–1377 preempt the field and allow the petitioner as a shareholder of the two subchapter S corporations ordinary deductions for the full amount of the corporations' operating losses during their taxable years ended January 31, 1967, to the extent of his adjusted basis in the stock and any indebtedness of the corporations to him. The losses from his business are to be treated in the same manner as if the business had been conducted as a sole proprietorship.

In this case, very different tax results follow from the order in which two deductions are taken. If the worthless stock (capital) loss must be taken first, basis is reduced to zero and no section 1374 ordinary deduction is available. On the other hand, if a

section 1374 deduction is taken first, the basis is thereby used up and little or no worthless stock loss remains. The majority adopts the apparently Solomonic solution of splitting the taxable year, "presuming" contrary to fact, that the stock was "disposed of" when the corporations became bankrupt. I am of the view, however, that the correct "stacking" rule for a subchapter S corporation is to permit the section 1374 deduction for the full taxable year's losses, and to reduce the stock basis accordingly at the end of the taxable year and to limit a subchapter S corporation's worthless stock loss to any basis unrecovered after all available section 1374 deductions and section 1016(a)(18) adjustments have been applied.

Rather than search for fragmentary purported clues to a "Congressional intent" through overly close sifting of the statutory provisions, I believe we should frankly recognize the fact that Congress failed to advert to the question of the proper stacking order here. Had it considered the matter it would surely have incorporated far more precise directions in the statute, or at least in committee reports. As it is, nothing on the face of the statutory language or in legislative history definitively instructs us which deduction is to be given priority. It seems quite possible within the statutory framework to argue for stacking either deduction below the other, or even to split the difference, as does the majority. Under these circumstances, I believe the soundest result will be achieved by considering which stacking rule best effectuates the general congressional purpose underlying subchapter S. So viewed, there can be little doubt that the proper rule is to give the section 1374 deduction preference. Subchapter S was designed to assimilate, insofar as possible, tax attributes of an electing corporation to those of a partnership or proprietorship.

Section 1374(a) provides that a subchapter S corporation's net operating loss "shall be allowed as a deduction from gross income of the shareholders of such corporation." The amount of the allowable deductions is limited by section 1374(c)(2) to the shareholder's adjusted basis for the stock and the corporation's indebtedness to the shareholder. Once the subchapter S election has been made and as long as it remains in effect, these provisions clearly contemplate that the corporation's operating losses are to be passed through to and deducted by the

shareholders. Thus S. Rept. 1983, 85th Cong., 2d Sess. (1958), 1958–3 C.B. 1009, states:

Under this provision the net operating losses of the corporation currently also are passed through to the shareholder. Thus, at the corporate level where this special treatment is elected, there is no carryover or carryback of operating losses to or from a year with respect to which this special treatment has been elected. *At the individual level these "distributed" corporate losses are to be treated in the same manner as any loss which the individual might have from a proprietorship;* that is, they first offset income of the individual in that year (whether or not derived from another business) and then any excess of these losses may be carried back and offset against the individual's income in prior years and, if any losses still remain, they may be carried forward and offset against his income in subsequent years. [Emphasis added.]

House Conference Report 2632, 85th Cong., 2d Sess. (1958), 1958–3 C.B. 1223, reiterates the intention that the shareholders are to deduct the electing corporation's losses as if the business were a sole proprietorship as follows:

The net operating losses of the small business corporation are passed through currently to the shareholder. There is no carryover or carryback at the corporate level of operating losses to or from a year with respect to which this special treatment has been elected. *At the individual level these corporate losses are to be treated in the same manner as any loss which the individual might have from a proprietorship.* [Emphasis added.]

Generally speaking, Congress intended losses to flow through to the owners to the extent of their basis in corporate stock and debt. See *Mason v. Commissioner*, 68 T.C. 163, 169 (1977). Respondent's position herein would frustrate that statutory objective. It would "keep the word of promise to our ear and break it to our hope" in a corporation's year of failure by depriving the investor of his basis before he could use the year's losses. I would therefore reject stacking rules which reach that unfortunate result either wholly (respondent) or partially (the majority).

Indeed, even if we limit ourselves to clues in the statutory language, and without regard to the legislative purpose of subchapter S, we reach the same result. In the form effective for the years in controversy section 1374(d)(1) provides· that the deduction allowed to the shareholder shall "for purposes of this chapter, be considered as a deduction attributable to a trade or business carried on by the shareholder." See the corresponding current provision in section 1374(b). True, the amount of the shareholder's loss is limited to the amount of his adjusted basis

for his stock and any indebtedness of the corporation to him. But, significantly, the amount of such adjusted basis under section 1374(c)(2)(A) and (B) is to be computed "as of the close of the taxable year of the corporation." Section 1376(b) provides for the reduction of the shareholder's basis in stock and the corporation's indebtedness to him by the corporation's net operating loss attributable to such stock which under section 1374 is deductible by the shareholder. There is no provision in the statute for interrupting the subchapter S corporation's taxable year to determine whether the shareholder's stock and the corporation's indebtedness to him are worthless.

It is true that section 1374(b) allows a deduction of operating losses to a shareholder who has that status "at any time during a taxable year * * * in which * * * a net operating loss" has been incurred. Section 1374(c) contemplates that the shareholder's adjusted basis in his stock shall be determined as of the close of the taxable year of the corporation or as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation. It is also true that section 165(g)(1) provides that if a security which is a capital asset becomes worthless during a taxable year the loss resulting therefrom shall be treated as a loss from the sale or exchange on the last day of the taxable year of a capital asset. As a minimum, if this provision is applicable, the taxpayer's loss should be prorated to December 31, 1966, not to the onset of the bankruptcy, but I do not think these general provisions on losses override the more specific provisions of sections 1374 and 1376 relating to the losses of subchapter S corporations.

FEATHERSTON and WILBUR, *JJ.*, agree with this dissenting opinion.

WILES, *J.*, dissenting: I respectfully dissent as to the first issue. I cannot agree with the majority's analysis that "the onset of worthlessness constituted a disposition of petitioner's interest in the two corporations." Instead, I would follow this Court's prior discussion in *Levy v. Commissioner*, 46 T.C. 531 (1966), and referred to in *Zinn v. Commissioner*, T.C. Memo. 1972–224.

The majority's finding of a disposition of petitioner's stock under section 1374(c)(2)(A) permits petitioner an ordinary loss in

1967 under section 1374(b) whereas if there had been no such disposition petitioner would have been restricted to capital loss deductions in 1966 under sections 165(g)(1) and 166(d)(1)(B). More specifically, the majority relies upon sections 165(g)(1) and 166(d)(1)(B) and upon the bankruptcy of the subchapter S corporations to support its conclusion that worthlessness constituted a disposition of the stock within the meaning of the second parenthetical in section 1374(c)(2)(A). The majority fails to cite, and I am unable to find, any support for this analysis. I would limit the interpretation of sections 165(g)(1) and 166(d)(1)(B) to their functions: loss characterization devices.

The sale or exchange treatment of sections 165(g)(1) and 166(d)(1)(B) are rules of constructive disposition, not of actual disposition. When stock becomes worthless during the taxable year, section 165(g)(1) provides that "the *loss* resulting therefrom shall * * * be *treated* as a loss from the sale or exchange" of the stock. (Emphasis added.) Similarly, section 166(d)(1)(B) provides that "where any nonbusiness debt becomes worthless within the taxable year, the *loss* resulting therefrom shall be *considered* a loss from the sale or exchange * * * of a capital asset held for not more than 6 months." (Emphasis added.) Congress provided the constructive disposition rule of section 165(g)(1), however, only to establish tax parity between a taxpayer who actually sells or exchanges his stock at a loss and one whose stock merely becomes worthless without actual disposition. Absent this rule, the taxpayer holding worthless stock would be entitled to an ordinary loss while the taxpayer actually disposing of his stock would be limited to a capital loss. This constructive disposition device is not confined to sections 165(g)(1) and 166(d)(1)(B). See, e.g., secs. 302(a), 402(a)(2), 631(a), 1231(a), 1232(a)(1), and 1241. Because Congress has accepted the responsibility or selectively using constructive dispositions, we should be hesitant to expand a statute by implying a sale or exchange or extending the constructive disposition rule of a particular statute. See *Helvering v. William Flaccus Oak Leather Co.*, 313 U.S. 247, 251 (1941); *Pounds v. United States*, 372 F.2d 342, 350–351 (5th Cir. 1967).

The majority also relies upon a state of bankruptcy to argue that petitioner lost all the "economic benefits" of his stock and debt ownership. I believe the only relevance of bankruptcy is to establish the worthlessness of petitioner's stock and debt in 1966.

Presumably the parties as well as the majority agree. The majority notes neither party attached any significance to the bankruptcy other than to establish worthlessness. Moreover, the majority relies upon worthlessness, however suffered, and not bankruptcy as the triggering event for a sale or exchange. Since worthlessness and not bankruptcy is the basis of the majority's analysis, the loss of economic benefits through bankruptcy is irrelevant.

In my view, petitioner, in 1966, will have a section 165(g)(1) deduction for worthless securities and a section 166(d)(1)(B) bad debt deduction. This result is in fact required by *Boehm v. Commissioner*, 326 U.S. 287, 292 (1945), which states that such losses must be taken in the taxable year of worthlessness. Section 1016(a)(1) would require a 1966 downward basis adjustment to petitioner's stock and debt leaving him with a zero basis in both at December 31, 1966. Then, unless petitioner furnished additional loans and/or capital to the two subchapter S corporations between January 1, 1967, and January 31, 1967, he would have no adjusted basis available to offset any corporate losses under section 1374(c)(2) for the corporate year ended January 31, 1967. As such, the entire amount of the corporate loss for that year would be lost as a deduction. Sec. 1.1374–1(b)(4)(i)(*b*), Income Tax Regs.[1]

This is precisely the view expressed in dictum by this Court in *Levy v. Commissioner, supra* at 538, where we stated under nearly identical facts:

> The petitioners' principal contention is that section 1376(b) of the Code requires that the net operating loss of the corporation be first allowed to them as a deduction for 1959 and that the bases of their stock and loans be adjusted on account thereof *before* determining the amount to be allowed as a deduction on account of the worthlessness of the stock and debts. *This contention of the petitioners is, we think, clearly contrary to the plain meaning of the statute.* Section 1374(c)(2) specifically provides that a shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of the adjusted bases, determined as of the close of the corporation's taxable year, of the shareholder's stock and the indebtedness of the corporation to him. *As pointed out above the petitioners have not shown that the stock and indebtedness did not become worthless in the taxable year 1958*

---

[1] This is an important distinction between subch. S corporations and partnerships. In a partnership, a partner could recoup the partnership loss in a later year by furnishing additional capital. Compare sec. 1.1374–1(b)(4)(i)(*b*), and sec. 1.704–1(d)(1), Income Tax Regs.

*with the consequence that the adjusted bases thereof would be zero at February 28, 1959.* [Emphasis added.]

We subsequently referred to *Levy* in *Zinn v. Commissioner*, T.C. Memo. 1972–224. See also B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 6.07, p. 6–26 n. 54 (3d ed. 1971). I see no reason for deviating now from the view expressed in those prior cases.

In reaching this result, I believe the basis provisions of sections 1016(a)(1) and 1016(a)(18) are consistent. These provisions are not operative in and of themselves but adjust the asset "cost" to the taxpayer to reflect the consequences of various taxable transactions. Timing is important here. In this case petitioner's section 1016(a)(1) adjustments occur in 1966, the year the sections 165 and 166 losses are deducted. Any basis adjustments flowing from the January 31, 1967, net operating losses would be made in 1967, the year of deductibility unless there is an actual disposition of the stock in 1966.[2] Secs. 1016(a)(18), 1376(b), and 1374(b); sec. 1.1374–1(b)(2), Income Tax Regs.

In my opinion, the constructive disposition rule of sections 165(g)(1) and 166(d)(1)(B) simply is not intended to create actual dispositions for purposes of applying subchapter S rules. The second parenthetical in section 1374(c)(2)(A) comprehends only actual dispositions. Had petitioner actually disposed of his stock before October 26, 1966, section 1374(c)(2) would operate to fix the amount of his corporate loss which would be deductible as an ordinary loss in 1967 under section 1374(b). Since he failed to dispose of his stock prior to bankruptcy, however, he receives only a capital loss in 1966 for his worthless stock and debt which reduces his basis to zero and thus 1374(c)(2) prevents him from deducting any subchapter S losses under section 1374(b). If Congress intended to allow the subchapter S provisions to override the operation of other controlling statutes such as sections 165(g) and 166(d), then they should have so provided. Until that time, I believe the statutes speak for themselves.[3]

_____

[2] If the stock is disposed of in 1966 within the meaning of sec. 1374(c)(2)(A), petitioner's basis adjustments for his 1967 deductible loss would be made in 1966 under sec. 1016(a)(18). Sec. 1.1376–2(a)(3)(i), Income Tax Regs.

[3] Judge Hall dissents from the majority opinion and would allow a sec. 1374(b) deduction in 1967 as if petitioner had held his stock for the full 1966 calendar year. While I agree with her reasoning which rejects the majority's Oct. 26, 1966, constructive stock disposition theory, I respectfully disagree with her conclusion that petitioner is entitled to a full subchapter S loss deduction in 1967.

716

FAY, QUEALY, and GOFFE, *JJ.*, agree with this dissenting opinion.

---

Essentially, her analysis requires petitioner's stock and debt basis to be "held open" at Dec. 31, 1966, so that the sec. 1016(a)(18) subch. S loss adjustments for 1967 could be made prior to the 1966 secs. 165 and 166 adjustments under sec. 1016(a)(1).

The problem with this analysis, as her opinion frankly recognizes, is that it lacks any support in the statutory or legislative history. Further, it contradicts the Supreme Court's analysis in *Boehm v. Commissioner,* 326 U.S. 287, 292 (1945), which requires losses due to worthlessness to be taken only in the year of worthlessness. Under *Boehm,* it is not possible to "hold open" 1966. The losses must be taken in 1966 which reduce the basis of petitioner's stock and debt to zero under sec. 1016(a)(1).