ROBERT J. FEGAN AND MARION E. FEGAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
FEGAN v. COMMISSIONER
Docket No. 7247-81.
United States Tax Court
T.C. Memo 1982-435; 1982 Tax Ct. Memo LEXIS 311; 44 T.C.M. (CCH) 636; T.C.M. (RIA) 82435; July 29, 1982. *311 Held: Petitioner is not entitled to a bad debt deduction in 1977 because the debt arising from his payment as guarantor on the note of a corporation in which he owned stock was a non-business debt that did not become totally worthless in 1977. Murray F. Hardesty and Thomas F. Puckett, for the petitioners. Alan M. Jacobson, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1977 and 1978 in the amounts of $59,302 and $12,024, respectively. Due to concessions by both parties, the sole issue for decision is whether petitioners were entitled in 1977 to business bad debt deductions in the total amount of $105,700. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The parties stipulated that Robert J. Fegan (hereinafter petitioner) and Marion E. Fegan, husband and wife, resided in Junction City, Kansas, when they filed the petition in this case. At the trial, the parties stated that Mrs. Fegan had died on June 20, 1981, and no administration of her estate was contemplated. They further agreed that a joint motion for dismissal as to *312 Mrs. Fegan would be filed and served on all heirs and next of kin. The motion would request that a decision be entered against Mrs. Fegan for the same deficiencies, if any, as the Court ultimately finds against petitioner. The trial thereupon proceeded as if Mrs. Fegan had been dismissed. Subsequent to the trial, such a joint motion has been filed and served and no objections were received from Mrs. Fegan's heirs and/or next of kin. In connection with entry of judgment we will grant this motion dismissing Mrs. Fegan and finding deficiencies against her equal to those found against Mr. Fegan. Tomkar Corporation was organized in 1957 but remained dormant until 1965, at which time it was reactivated to manufacture safety sights--a type of water level gauge intended for use in the automobile industry. When Tomkar was reactivated, petitioner paid $20,000 for 1,000 shares of stock, which gave him 20 percent of the outstanding stock. Thomas R. Demyon, the inventor of the safety sight, held 2,000 shares, giving him 40 percent of the stock. The remaining 40 percent was held by approximately 20 other individuals. On June 5, 1965, petitioner was elected as a director and chairman of the *313 board of Tomkar, and Mr. Demyon was elected as a director and president. Salaries were assigned to the four principal officers and the chairman of the board, whose salary was set at $10,000 per year. However, none of the salaries were intended to be paid unless and until the corporation became successful, and none were ever paid except for small amounts paid to Mr. Demyon, who was involved in the day-to-day operation of the business and had no other significant source of income. Tomkar's hopes of making substantial profits turned primarily on its efforts to get a contract with one of the major automotive manufacturers. In the late 1960's, Tomkar had extensive negotiations with the leading domestic automobile manufacturers. However, thenegotiations fell through, and by 1970 the chances of selling the safety sights to the major domestic manufacturers seemed poor. Nevertheless, Tomkar continued in business, selling safety sights to smaller automotive manufacturers, at least until 1980. Gross sales increased from $71,601.04 in 1970 to $251,511.94 in 1979, and in 1980, the year before Tomkar ceased business, gross sales of $191,480.89 were reported. In each of the years 1970 through *314 1980 Tomkar had a net loss [1] except for 1978 and 1979 in which it had net profits of $14,106.01 and $9,650.98, respectively. Tomkar's manufacturing operations were conducted in Baltimore, Maryland, under the direction of Mr. Demyon, who was also the primary salesman for the corporation. Between his election as chairman of the board in 1965 and his resignation on February 12, 1976, petitioner was not involved in the day-to-day management of the corporation but performed oversight responsibilities typical of a director rather than an employee. He periodically flew from Kansas to Baltimore to attend board meetings or confer with Mr. Demyon or others concerning the course of the business [2] and sometimes conversed with Mr. Demyon by telephone concerning the business. After his resignation in 1976, petitioner was not involved in any way in the operation of the business. On September *315 9, 1968, because of its need for operating capital, Tomkar borrowed, on petitioner's endorsement, $90,000 from the First National Bank of Junction City (hereinafter referred to as the Bank). On March 5, 1969, when these notes were extended, petitioner furnished the Bank his written guarantee, and in September 1969 the aggregate amount of borrowing by Tomkar increased to $100,000. On November 23, 1971, Demyon gave the Bank his written guarantee and furnished as collateral his 2,000 shares of Tomkar stock and three patents relating to the safety sight, which were issued in 1964 or 1965 and due to expire in 1981 or 1982. On February 4, 1977, the notes were consolidated into a signle $100,000 note, and delinquent interest of almost $11,000 was paid by petitioner. Both petitioner and Demyon continued to personally guarantee the loan, and the Bank continued to hold as collateral Demyon's 2,000 shares of Tomkar stock and safety sight patents. On July 18, 1977, the Bank informed Demyon that its board of directors and the National Bank Examiners had determined that it should no longer carry the loan to Tomkar and that demand was therefore being made for payment of the $100,000 principal *316 plus $4,750 in accrued interest. After learning of this demand for payment, petitioner called Demyon and was advised that neither Tomkar nor Demyon personally could pay the Bank. Although petitioner did not actually review Demyon's personal financial situation, he had known Demyon for over 15 years and believed Demyon had no substantial assets. Petitioner also believed that Tomkar would never be able to pay the loan because he believed it was hopelessly in debt, the patents were due to expire within a few years, and no progress had been made in negotiations with automotive manufacturers. According to Tomkar's December 31, 1976, balance sheet, it had some assets, including $10,063.67 of cash on hand, accounts receivable of $11,374.64 and inventory valued at $25,000, but its liabilities were far in excess of its tangible assets. On August 4, 1977, petitioner paid the Bank $104,750, and the note was canceled. On August 5, 1977, the Bank delivered to petitioner the file containing the stock and patent letters pledged by Demyon as collateral. Petitioner has taken no action to collect from Tomkar or to have Demyon contribute because of his personal guarantee. Petitioner continues to *317 own 1,000 shares of Tomkar stock and also still holds Demyon's 2,000 shares and the patent letters. During the time petitioner served as chairman of the board of Tomkar, he also guaranteed at least $65,000 in loans to Tomkar from other banks in Kansas, which, like the loans from First National Bank of Junction City, were used to provide operating capital. These loans have not yet been called in by the other banks, and petitioner has never had to pay because of his guarantees of these loans. Prior to May 1968, petitioner was president and general manager of Junction City Telephone Company, a local telephone company virtually completely owned by petitioner and his brother. As of 1968, petitioner received a salary of approximately $25,000 per year from this company. In 1968, Junction City Telephone Company was sold to United Utilities (which later became United Telecommunications). In the sale, petitioner received not only stock in United Utilities, from which he has been receiving substantial dividend income since 1969, but also the right to annuities and consultant's fees. Petitioner has also been receiving considerable dividend income from other investments. On his income tax *318 return for 1977 petitioner claimed a bad debt deduction of $121,374. On audit respondent disallowed the entire deduction less $15,674 allowed for interest paid by petitioner, [3] *319 for a new adjustment of $105,700. Of this net adjustment $100,000 related to petitioner's payment of his guarantee; and, according to his vague and uncorrobated testimony at trial, the other $5,700 was for money he had given Tomkar because the corporation could not meet its bills. OPINION When a taxpayer pays a creditor of a third party because of the taxpayer's prior guarantee of a debt between the creditor and the third party, a new debt arises between the taxpayer and the third party by reason of subrogation. Putnam v. Commissioner,352 U.S. 82 (1956); Benak v. Commissioner,77 T.C. 1213 (1981); Gillespie v. Commissioner,54 T.C. 1025, 1031 (1970), affd. per unpublished order (9th Cir. 1972); section 1.166-8, Income Tax Regs. Although the debt between the third party and the taxpayer does not arise until the taxpayer actually pays the creditor because of the guarantee, the characterization of the debt is based upon the facts as of the time when the guarantee was initially given. [4] See Gillespie v. Commissioner,supra at 1031-1032. Thus, in determining whether the debt owed to petitioner by Tomkar as a result of his paying *320 the guarantee was a business or a nonbusiness debt, we should look at the facts as of 1969 when the guarantee was given, not 1977 when the guarantee was paid, and section 1.166-8, Income Tax Regs., pertaining to losses incurred under agreements made before January 1, 1976, should be applied. This regulation states that a loss sustained by a noncorporate taxpayer in the discharge of a guarantee of an obligation issued by a corporation shall be treated in accordance with section 166(d). [5]Section 166(d)(1)[6] *321 and section 1.166-5(a), Income Tax Regs., provide that a nonbusiness bad debt of a noncorporate taxpayer is to be treated as a capital loss in the year the debt becomes wholly worthless. We must first determine whether the debt of Tomkar to petitioner that arose upon petitioner's discharge of his guarantee was a nonbusiness bad debt as defined in section 166(d)(2). Whether a particular debt is a business or nonbusiness debt is to be determined from an examination of the relationship of the loan to the taxpayer's trade or business. Section 1.166-5(b), Income Tax Regs. When the taxpayer is both a shareholder and an employee of the debtor corporation, *322 the test to be applied is whether the taxpayer's dominant motivation in advancing funds to the corporation was to protect his employment rather than his investment in the corporation. United States v. Generes,405 U.S. 93, 100-105 (1972); Putoma Corp. v. Commissioner,66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979). Petitioner contends that his dominant motivation in guaranteeing the loan to Tomkar was to protect his status as an employee. However, this case appears to be a fairly typical example of a wealthy investor financing the operations of a small business in the hope or expectation of a substantial profit. Petitioner's purported salary of $10,000 per year, which was understood could not be paid unless and until the corporation became successful, and petitioner's limited activities with respect to Tomkar, cannot support a contention that the guarantee was motivated by a desire on the part of the petitioner to protect his employment by Tomkar. Also significant is the fact that even if the $10,000 salary had been paid to petitioner, it would have been relatively insignificant when compared to the substantial income he received from annuities and investments. [7] *323 Nor can petitioner show that he was engaged in the trade or business of financing small companies. Most of his investments were in stock of publicly traded companies, most notably United Utilities. Petitioner appears to fall directly within the language of Mr. Justice White in Whipple v. Commissioner,373 U.S. 193, 202 (1963): When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Therefore, petitioner's guarantee in 1969 should be construed as his method of enabling Tomkar to obtain working capital to use in exploiting the patents and know-how of the principal stockholder, and the debt between Tomkar and petitioner that arose when petitioner discharged *324 the guarantee must be construed as a nonbusiness debt. Since a loss on a nonbusiness debt shall be treated as sustained only if and when the debt has become totally worthless, section 1.166-5(a)(2), Income Tax Regs., we must next determine whether this nonbusiness bad debt became wholly worthless in 1977. Whether a debt has become totally worthless in a taxable year is a question of fact to be determined from all the circumstances, section 1.166-2(a), Income Tax Regs., with the burden of proof on petitioner. Denver & Rio Grande Western Railroad Co. v. Commissioner,279 F.2d 368, 375 (10th Cir. 1960), affg. 32 T.C. 43 (1959). The taxpayer has not met this burden of proof here. Petitioner's payment of the guarantee had no effect on the obligation of Tomkar except that under normal principles of law petitioner became subrogated to the rights of the Bank against Tomkar. [8] Because of this subrogation, petitioner received the collateral previously held by the Bank, i.e., Demyon's 2,000 shares of Tomkar stock and the patent letters relating to the safety sights. Petitioner made no efforts to compel Tomkar to pay the debt owed to him. While it appears that Tomkar's liabilities in 1977 *325 substantially exceeded its tangible assets and that it would have been insolvent if liquidated, it did have some tangible assets, which should have entitled petitioner to receive partial payment upon liquidation. Petitioner's contention that Tomkar was unable to pay the debts even in part in 1977 conflicts with the reality that Tomkar continued to operate after 1977. In 1978 it had gross sales of $208,609.35 and for the first time it reported a net profit--$14,106.01. None of the loans from other banks were called. Furthermore, had petitioner foreclosed on Demyon's shares of *326 Tomkar stock pledged as collateral, he would have had 60 percent control and would have been in a strong position to assure that he was reimbursed, at least in part, for his payment of the guarantee and for his other loans to the corporation. [9]
Therefore, we find that petitioner was not entitled to treat the $100,000 it paid the Bank as a bad debt loss in 1977. The bad debt deduction claimed by petitioner for 1977 included not only the $100,000 paid on account of his guarantee but also $5,700 he claimed he gave to Tomkar because they could not meet their bills. Petitioner did not explain when this purported loan was made or any circumstances surrounding it. Nor did he introduce any canceled checks, corporate records, or other evidence to back up this brief and imprecise reference to the purported loan. Petitioner's failure to produce evidence on this point compels us to hold that he has not proven the existence *327 of the loan and is therefore not entitled to deduct the $5,700 in 1977. Furthermore, even if petitioner had proven the loan actually had been made, he would still not be entitled to a deduction in 1977 because, like the $100,000 debt arising from his discharge of his guarantee, this debt would necessarily be a nonbusiness bad debt that did not become totally worthless in 1977. Decision will be entered under Rule 155.
Footnotes
1. Net losses were reported as $9,829.66 in 1970; $6,358.94 in 1971; $1,411.11 in 1972; $263.44 in 1973; $222.26 in 1974; $14,184.71 in 1975; $10,653.20 in 1976; $11,269.61 in 1977; and $369.43 in 1980.↩
2. May of these trips to Baltimore was in conjunction with other activities of petitioner in nearby Washington, D.C.↩
3. Evidently, respondent allowed the amounts petitioner paid to the Bank because of accrued interest to be deducted under sec. 163 as interest. Since respondent took this position, we need not consider whether petitioner's payment of the accrued interest actually constituted the payment of interest or was instead a loan from petitioner to Tomkar, giving rise, like the payment of the principal, to a debt from Tomkar to petitioner. See Nelson v. Commissioner,281 F.2d 1, 5-6 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Abdalla v. Commissioner,647 F.2d 487, 503-504 (5th Cir. 1981), affg. 69 T.C. 697, 706-708 (1978); and Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 565 (1980), which recognize that a guarantor, who is secondarily liable, cannot normally take an interest deduction under sec. 163 for accrued interest paid on a debt he guaranteed; the guarantor's payment of interest gives rise to a debt, which is treated under sec. 166. See also sec. 1.166-9(a), Income Tax Regs.↩, which applies only to agreements made after Dec. 31, 1975.
4. That the 1969 loans were subsequently consolidated into a single note in February 1977 has no bearing upon the date to be focused upon in analyzing whether there is a business or nonbusiness bad debt since the same guarantee that was made in 1969 continued unchanged until petitioner was called upon by the Bank to pay in August 1977. ↩
5. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
6. Sec. 166(d) provides: (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 9 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
7. That an individual was not dependent on his employment by the corporation to which he loaned money has often been relied upon in finding debts to have been of a nonbusiness character. See, e.g., Baker v. Commissioner,T.C. Memo. 1981-137↩.
8. It is presumed that the law of Kansas would apply, although the record does not make that clear. However, the only other state having any remote connection to the transaction would be the State of Maryland, which was the domicile of the corporation. Under the law of either state, petitioner would be subrogated to the rights of the Bank against Tomkar. Compare Md. Com. Law Ann. sec. 15-401 (1975), and Northwestern National Insurance Co. v. Goldstein,35 Md. App. 30, 368 A.2d 1095 (1977), with Kan. Stat. Ann. 84-9-504(5) (1965), and Mountain Iron and Supply Co. v. Jones,201 Kan. 401, 441 P.2d 795↩ (1968).
9. We note that petitioner claimed in 1977 no deduction for worthless stock with respect to his 20 percent interest in Tomkar, a position inconsistent with his claim of a bad debt deduction in that year since both sec. 165(b) and sec. 166↩ employ a similar test of worthlessness.